STATE OF NORTH CAROLINA, EX REL UTILITIES COMMISSION, SERVICE TRANSPORTATION CORPORATION, AND M & M TANK LINES, INC., APPLICANTS v. ASSOCIATED PETROLEUM CARRIERS, A. C. WIDENHOUSE, INC., SOUTHERN OIL TRANSPORTATION COMPANY, INC., TERMINAL CITY TRANSPORT, INC., EASTERN OIL TRANSPORT, SCHWERMAN TRUCKING COMPANY, PETROLEUM TRANSPORTATION, INC., AND CAROLINA ASPHALT AND PETROLEUM COMPANY, PROTESTANTS

No. 7010UC37

(Filed 1 April 1970)

**1. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — necessity for showing public need**

The showing of public need which G.S. 62-262(e)(1) requires of an application for a new motor carrier certificate is not applicable in a transfer proceeding under G.S. 62-111 and was not written into it by G.S. 62-111(a).

**2. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — public convenience and necessity**

The requirement of "public convenience and necessity" referred to in G.S. 62-111(a), relating to transfer of a public utility franchise, is satisfied by a showing that the authority has been and is being actively applied in satisfaction of the public need which was shown to exist when the authority was originally acquired.

**3. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — finding that transfer is in the public interest**

Requirement that the Commission find a proposed transfer to be "in the public interest" does not write into the transfer approval procedure the G.S. 62-262(e)(1) new certificate test of public need.

**4. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — finding that transfer will not adversely affect service to the public**

Requirement of G.S. 62-111(e) that the Commission find that the proposed transfer "will not adversely affect the service to the public under said franchise" is satisfied by a determination that the proposed transferee of the franchise is capable of rendering service equal to that of the proposed transferor, and does not prohibit approval where transfer of the franchise to a more competitive hauler would have an adverse effect on existing carriers.

**5. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — ability of purchaser to perform services — effect on service to public — effect on service by other carriers — sufficiency of evidence**

In this proceeding to obtain approval of the Utilities Commission for transfer of a common motor carrier franchise for intrastate transportation of liquid asphalt, there was competent, material and substantial evidence to support the Commission's findings that the proposed purchaser is fit, willing and able to perform the service to the public under the franchise, that service to the public under the franchise will not be adversely affected, but that the purchaser will offer greater service to the public under the franchise, and that the transfer will not unlawfully affect the service to the public by other public utilities.

**6. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — increased competition — public interest**

The possibility that a transfer of a motor carrier franchise to a more competitive carrier will adversely affect other existing carriers does not make such a transfer contrary to "the public interest" under G.S. 62-111(e).

**7. Carriers § 3; Utilities Commission § 7— transfer of motor carrier certificate — finding that transfer is in the public interest**

In this proceeding to obtain approval of the Utilities Commission for transfer of a common motor carrier asphalt franchise, the record fails to show that increased competition which the purchaser proposes to provide under the franchise would be contrary to "the public interest" as distinguished from the interests of the protestants.

:8. Carriers § 3;    Utilities Commission § 7—    transfer of motor carrier
   certificate — finding that service under the franchise has been con-
   tinuously offered

    In this proceeding to obtain approval of the Utilities Commission for
transfer of a common motor carrier asphalt franchise, there was compe-
tent, material and substantial evidence to support the Commission's find-
ing "that the service under said franchise has been continuously offered
to the public up to the time of the filing of said application," where the
applicant's evidence showed that the proposed transferor has kept an
asphalt tariff on file with the Utilities Commission since it was certified
as an asphalt carrier, that although the proposed transferor did not
actively solicit asphalt business for the 1963-1966 hauling seasons and
hauled no asphalt during those seasons, it has never refused to handle
any asphalt shipment, and that it hauled four or five loads of asphalt in
1967 and approximately 25 loads in 1968, when the application for the
franchise transfer was filed with the Commission.

APPEAL by protestants from an order of the North Carolina Util-
ities Commission dated 2 July 1969.

This proceeding was initiated by an application filed with the
North Carolina Utilities Commission on 4 September 1968 under
which M & M Tank Lines, Inc. (M & M) seeks authority to pur-
chase the common carrier operating authority held by Service Trans-
portation Corporation (Service) to transport liquid asphalt in bulk
in tank trucks within the State of North Carolina. Within apt time
a protest and motion for intervention was filed by eight carriers au-
thorized to transport such asphalt in intrastate commerce in North
Carolina.

The matter came on for hearing before Commissioners Williams
(presiding), McDevitt and Biggs on 20 November 1968. The Com-
mission made findings of fact and on 2 July 1969 issued its order
approving the transfer of operating authority sought in the applica-
tion. The following is quoted from the order:

## FINDINGS OF FACT

"1.   That SERVICE is a duly organized corporation, with offi-
ces off U.S. 601, Box 51, Salisbury, North Carolina. SERVICE
owns and holds Common Carrier Certificate No. C-339 issued
by this Commission, which contains, inter alia, the authority
sought to be transferred herein, which is more particularly de-
scribed in Exhibit B hereto attached and incorporated herein
by reference.

2.   That M & M is the owner and holder of Common Carrier
Certificate No. C-198 issued by this Commission and has inter-

state authority issued by the Interstate Commerce Commission. M & M is a substantial hauler of bulk products and had adequate equipment, experience, financial resources and is otherwise fit and able to perform the transportation service authorized by the authority sought to be purchased by it.

3. That SERVICE first acquired the authority sought to be transferred together with its petroleum authority when it was first certificated as a result of the 1947 Truck Act; that SERVICE has owned no equipment for handling asphalt since 1963 and actually hauled no asphalt during the years 1963, 1964, 1965 and 1966. During those years it did not actually solicit any asphalt business although it has remained a party to the asphalt tariff filed with this Commission. During those years, SERVICE was not tendered any shipments. That during the year 1967, SERVICE began soliciting asphalt shipments and hauled by means of lease equipment, 4 or 5 shipments during that season; that again during the year 1968, SERVICE solicited this business and received approximately 25 to 30 loads for shipment, the last shipment being within 10 days of the date of the hearing. These shipments were also made by use of leased equipment.

4. That the transfer of the operating authority, described herein is in the public interest, will not adversely affect the service to the public under said franchise, will not unlawfully affect the service to the public by other public utilities, and the purchaser, M & M, is fit, willing and able to perform the service to the public under said franchise and that SERVICE (sic) under said franchise has been continuously offered to the public up to the time of the filing of said application, and that approval of the transfer is justified by the public convenience and necessity and the transfer should be approved."

ORDER

"1. That the application filed in this docket be and it is hereby approved and the applicant, Service Transportation Corporation, is hereby permitted to sell that portion of the authority contained in Common Carrier Certificate No. C-339 as set out on Exhibit B hereto attached to M & M Tank Lines, Inc., and M & M Tank Lines, Inc., is hereby authorized to purchase and operate said authority under that portion of said certificate.

2. That the applicant, M & M. Tank Lines, Inc., is hereby granted 30 days from the date of this Order to complete its

transaction with Service Transportation Corporation, to file with this Commission its list of equipment, schedule of minimum rates, evidence of financial security for the protection of the travelling and shipping public and otherwise. comply with all rules and regulations of this Commission."

From said order, protestants appealed to this Court.

*Commission Attorney Edward B. Hipp and Associate Commission Attorney Larry G. Ford for applicant appellee, North Carolina Utilities Commission.*

*Bailey, Dixon, Wooten & McDonald by J. Ruffin Bailey and Ralph McDonald for applicant appellees, Service Transportation Corporation and M & M Tank Lines, Inc.*

*Allen, Steed & Pullen by Thomas W. Steed, Jr., for protestant appellants.*

BRITT, J.

The protestants on appeal present the following issue: Is the order of the Utilities Commission in approving the transfer of common carrier franchise authority under the provisions of G.S. 62-111 erroneous as a matter of law and unsupported by competent, material and substantial evidence in view of the entire record? We think not.

The transfer of a carrier operating authority is governed by a comprehensive statutory scheme, which includes the following provisions of G.S. 62-111:

"(a) No franchise now existing or hereafter issued under the provisions of this chapter other than a franchise for motor carriers of passengers shall be sold, assigned, pledged or transferred, nor shall control thereof be changed through stock transfer or otherwise, or any rights thereunder leased, nor shall any merger or combination affecting any public utility be made through acquisition or control by stock purchase or otherwise, except after application to and written approval by the Commission, which approval shall be given if justified by the public convenience and necessity. Provided, that the above provisions shall not apply to regular trading in listed securities on recognized markets.

\* \* \*

(e) The Commission shall approve applications for transfer of motor carrier franchises made under this section upon finding

that said sale, assignment, pledge, transfer, change of control, lease, merger, or combination is in the public interest, will not adversely affect the service to the public under said franchise, will not unlawfully affect the service to the public by other public utilities, that the person acquiring said franchise or control thereof is fit, willing and able to perform such service to the public under said franchise, and that service under said franchise has been continuously offered to the public up to the time of filing said application or in lieu thereof that any suspension of service exceeding 30 days has been approved by the Commission as provided in G.S. 62-112(b) (5)."

In *Utilities Commission v. Coach Co.*, 269 N.C. 717, 153 S.E. 2d 461, the court construed the "public convenience and necessity" test of G.S. 62-111(a), enacted as part of the Public Utilities Act of 1963. The protestants in that case sought a construction of the statute which would provide them protection from competition: "* * * [P]rotestants contended in substance that G.S. 62-111(a) 'required the Commission to consider similar elements upon a transfer of franchise authority as upon the granting of an application for *new* authority,' (our italics) including 'public need for the service, the service already provided by existing carriers, and the effect of the service provided by the transferee on the operations of existing carriers.' "

[1]  To grant a *new* authority under G.S. 62-262(e) (1), the Commission must find "that public convenience and necessity require the proposed service in addition to existing authorized transportation service." The court held that the showing of public need which G.S. 62-262(e) (1) required of an application for a *new* authority was not applicable in a transfer proceeding and was not written into it by G.S. 62-111(a). The court observed: "The apprehension of protestants is that Caro-Line will undertake to exercise its franchise rights on a much larger and more varied scale, and in so doing act in competition with protestants and adversely affect their business. The record fails to show that operations by Caro-Line on a larger and more varied scale would be contrary to *the public interest* as distinguished from the interests of protestants."

[2]  The decision and language of *Coach Co., supra,* supported the position of the Utilities Commission that "the policy of the State, as declared in the Public Utilities Act of 1963, * * * clearly favors transfers of actively operated motor freight carrier certificates without unreasonable restraint. A policy following protestant's position would diminish the value of existing motor freight franchises

and deprive the holders thereof of valuable rights." *In re Comer Transport Service,* N.C.U.C. Docket No. T-821, Sub. 2, reported in N.C.U.C. Report 1965, p. 266. The Commission in effect interpreted the criteria "if justified by the public convenience and necessity" in G.S. 62-111(a) to be a statutory basis for the test of dormancy. Where the authority has been abandoned or "dormant," the Commission has denied applications for transfer because approval would in effect be the granting of a new authority without satisfying the new authority test of public need set out in G.S. 62-262(e)(1). Where the authority has been actively operated, the applicants for sale and transfer of motor freight carrier rights "are under no burden to show through shipper witnesses that a demand and need exists." *Comer, supra.* The rationale is that public convenience and necessity was shown to exist when the authority was granted or acquired under the 1947 grandfather clause, and the rebuttable presumption of law is that it continues. Thus, the Commission in *Comer* held that "the statutory requirement referred to [G.S. 62-111(a)] is satisfied by a showing that the authority has been and is being actively applied in satisfaction of the public need theretofore found." The position taken by the Supreme Court in *Coach Co., supra,* supports such an interpretation.

[3] The General Assembly supplemented the general provision of G.S. 62-111(a) that "approval shall be given if justified by the public convenience and necessity," with subsection (e) effective 30 September 1967. The amendment sets out certain specific criteria to be considered in the Commission's determination of whether approval in a given case is justified. It does not, on the other hand, indicate a policy change toward protecting existing certificate holders from lawful competition. Like the subsection (a) "public convenience and necessity" test, the requirement that the Commission find the transfer "in the public interest" does not write into the transfer approval procedure the G.S. 62-262(e)(1) new certificate test of public need.

[4] Protestants contend that the G.S. 62-111(e) clause requiring the Commission to find that the proposed transfer "will not adversely affect the service to the public under said franchise," prohibits approval where transfer of the franchise to a more competitive hauler would, as they argue, "have a definite adverse effect on the existing carriers." The language "under said franchise," however, indicates that this finding will be satisfied by a Commission determination that the proposed transferee of the franchise is capable of rendering service equal to that of the proposed transferor.

When the matter came on for hearing before the Commission on 20 November 1968, all parties were present and represented by counsel. The record discloses a full hearing at which the exhibits, direct and cross-examinations, and questions presented by the commissioners produced a comprehensive factual basis for the Commission's order. M & M's exhibit included a financial statement, data on employment practices, insurance coverage, safety programs, and rolling equipment. L. J. Steele, coordinator for traffic and sales for M & M, testified as to his company's ability and intention to "haul more product than Service Transportation has under the authority."

**[5]** There was competent, material and substantial evidence from which the Commission could find not only that "the purchaser, M & M, is fit, willing and able to perform the service to the public under said franchise," but also that M & M could render service equal to that of Service Transportation Corp. The record clearly established that the service to the public under the asphalt franchise will not be adversely affected, but, in fact, the transfer will result in the authority being held by a carrier that will be able to offer greater service to the public under the franchise. Protestants concede the point saying "that M & M Tank Lines, Inc., if it is permitted to acquire this franchise authority will conduct active and vigorous operations in the transportation of asphalt. M & M Tank Lines, Inc., has the financial ability and the equipment to become a major carrier in this product in intrastate commerce in North Carolina." Although the testimony of Carl Helms asserts the protestants' desire for protection, e.g., "We need to have some assurance, and we should have some protection, that someone is going to look after us because we have to put out thousands of dollars to do this," we do not read this clause as a protection against competition. Also, the finding that the transfer "will not unlawfully affect the service to the public by other public utilities," is fully supported; the record fails to disclose any unlawful affect upon the service rendered by the other utilities.

**[7]** Protestants contend that increased competition such as M & M proposes to provide will not be "in the public interest." Witnesses who were officials of Petroleum Transportation, Inc., Widenhouse, Inc., Schwerman Trucking Company and Carolina Asphalt and Petroleum Company testified as to a general decline in business in 1968. They pointed out that asphalt hauling is a sporadic business in which the shippers and road contractors demand instant service. Carl Helms testified: "Now, asphalt is very much different from the usual line of products because it has to be moved when the carriers

receive a call. We cannot wait a period of four or five days to move that particular product. It has to be moved at once because there are men at various job locations waiting on this product." The contention proceeds along the line that more competition would mean less business for the protestants and less business would result in a diminished capacity to render service to the public. William Thomas Barrow, Vice-President of A. C. Widenhouse, Inc., testified: "Sometimes we cannot give service because we don't have any drivers. The main reason for this is we don't have enough business to maintain 32 drivers." It appears that this is a problem inherent in a seasonal, sporadic business like asphalt hauling. While other carriers had a decline in business in 1968, Service acquired business by offering only an "overflow service." Jarrett testified: "In my solicitation of Chevron and American I asked them to call on us when they had a need for it and did not purport to handle all of their shipments. * * * I was offering to them an overflow service for any overflow that they probably could not get hauled by the regular shipper or haulers. This type of overflow would come when they had so many shipments at one time that their normal arrangements for shipping couldn't handle it at that particular time."

[6, 7]   In an earlier "Coach Co." case, *Utilities Commission v. Coach Co.,* 261 N.C. 384, 134 S.E. 2d 689 (1964), the court, through Moore, J., said: "There is no public policy condemning competition as such in the field of public utilities; the public policy only condemns unfair or destructive competition." The possibility that a transfer of authority to a more competitive carrier will adversely affect existing carriers does not make such a transfer contrary to "the public interest" as a matter of law. In G.S. 62-111 (e) the General Assembly has empowered the Utilities Commission to find in a proper case that transfer to a more actively competitive carrier might *not* be "in the public interest." In the instant case, however, the record fails to show that operations by M & M would, as Bobbitt, J., expressed it in *Coach Co., supra,* "be contrary to *the public interest* as distinguished from the interests of protestants."

[8]   Protestants contend that there is no competent, material and substantial evidence to support the Commission finding "that SERVICE (sic) under said franchise has been continuously offered to the public up to the time of the filing of said application." The record shows that Service was originated in 1939 and certified as an intrastate carrier of petroleum, petroleum products, and asphalt as a result of the 1947 Truck Act. Jarrett's father became principal stockholder in 1950 and Jarrett acquired control upon his father's

death in August 1968. Service has kept a tariff on file with the Utilities Commission and, as Jarrett testified: "I have participated in the petroleum or asphalt tariff section of the North Carolina Motor Carriers publication all the time that our company has held these rights. I think that this publication is circulated to shippers throughout the North Carolina intrastate area. It shows the scope of our company's operations and the territory." Although the company did not actively solicit business for the 1963-1966 asphalt hauling seasons, and no asphalt was hauled during those seasons, Jarrett testified: "Our company has never refused to handle any asphalt or any shipment from any point to any point." Jarrett testified that he had been fairly active in the operations of Service over the past few years, although he primarily operates an oil distributing company. His involvement with Service and his interest in actively soliciting asphalt hauling business grew as his father became sick approximately three years before his death in 1968. Jarrett solicited business from Chevron and American, "who are the only shippers of the product that I knew of at the time I contacted them." These solicitations resulted in Service hauling four or five loads during the 1967 season and approximately twenty-five during the 1968 season; rolling equipment to handle these jobs was obtained through a triplease arrangement with Davis Oil Company in 1967 and with M & M in 1968. Service and M & M discussed the proposed transfer during the 1968 season, worked out an agreement in August, and M & M filed its application on 4 September 1968. We hold that the record amply discloses competent, material and substantial evidence to support the Commission's finding.

The order of the Utilities Commission is

Affirmed.

BROCK and GRAHAM, JJ., concur.