393 S.E.2d 111 (1990)
99 N.C. App. 224
STATE of North Carolina, ex rel. UTILITIES COMMISSION, Public Staff and Regional Investments of Moore, Inc., Applicant-appellees,
v.
VILLAGE OF PINEHURST, Intervenor-appellant.
No. 8910UC825.
Court of Appeals of North Carolina.
July 3, 1990.
*113 DeBank, McDaniel, Heidgerd, Holbrook & Anderson by William E. Anderson, Raleigh, and Brown, Robbins, May, Pate, Rich, Scarborough & Burke by W. Lamont Brown, Southern Pines, for intervenor-appellant Village of Pinehurst.
Hunton & Williams by Edward S. Finley, Jr., Frank A. Schiller and Alaine Y. Miller, Raleigh, for applicant-appellee Regional Investments of Moore, Inc.
WELLS, Judge.
We note at the outset that the Village, in violation of N.C.R.App.P., Rule 28, has presented its arguments in the brief without any reference whatsoever to assignments of error pertinent to the questions. The Village's appeal is therefore subject to dismissal. Because this appeal presents important questions of public interest, we exercise our discretionary authority pursuant to N.C.R.App.P., Rule 2, and proceed to an examination of the merits of the Village's appeal.

I. GENERAL STANDARDS OF REVIEW
The standards which govern the review of a determination of the North Carolina Utilities Commission are set forth at N.C.Gen.Stat. § 62-94. Under this provision, the essential test to be applied is whether the Commission's order is affected by errors of law or is unsupported by competent, material, and substantial evidence in view of the entire record as submitted. Id.; see also Utilities Comm. v. Public Staff, 323 N.C. 481, 374 S.E.2d 361 (1988). G.S. § 62-94(e) further provides that upon appeal "any ... finding, determination, or order made by the Commission ... shall be prima facie just and reasonable." Thus, the party attacking an order of the Commission bears the burden under the statute of proving that such an order is improper. Public Staff, supra. Moreover, the credibility and weight of testimony are matters to be determined by the Commission. Id. Finally, in reviewing a decision of the Commission, "due account shall be taken of the rule of prejudicial error." N.C.Gen.Stat. § 62-94(c).

II. TRANSFER APPROVAL UNDER N.C.GEN.STAT. § 62-111(a)
Three of the six arguments advanced by the Village challenge the Commission's interpretation and application of G.S. § 62-111(a), governing the transfer of utility franchises. That statute provides in pertinent part:
No franchise now existing or hereafter issued under the provisions of this Chapter... shall be sold, assigned, pledged or transferred, nor shall control thereof be changed through stock transfer or otherwise, or any rights thereunder leased, nor shall any merger or combination affecting any public utility be made through acquisition or control by stock purchase or otherwise, except after application to and written approval by the Commission, which approval shall be given if justified by the public convenience and necessity.

A. "Public Convenience and Necessity" Test.
The first issue we confront under this statute concerns the proper definition of "public convenience and necessity." The *114 Commission's order provides in pertinent part:
G.S. 62-111(a) requires the Commission to approve applications for transfers when such transfers are justified by the public convenience and necessity, that is, that they will not adversely affect rates or service to the public. (Emphasis added.)
The Village contends that this definition of "public convenience and necessity" is impermissibly narrow, in fact creating an "impaired service" test, and that the Commission erred in applying so narrow a test in its approval of the proposed transfer. R.I.M., relying on Utilities Comm. v. Carolina Coach Co., 269 N.C. 717, 153 S.E.2d 461 (1967), counters that G.S. § 62-111(a) mandates that if the Commission finds that the transfer does not adversely affect service, then approval of the transfer must be given. R.I.M. concedes, however, that G.S. § 62-111(a) requires the Commission to "consider every factor bearing upon the applicant's ability to serve the public adequately."
In addressing this issue, we note that G.S. § 62-111(e) provides in pertinent part:
The Commission shall approve applications for transfer of motor carrier franchises made under this section upon finding that said ... transfer ... is in the public interest, will not adversely affect the service to the public under said franchise, will not unlawfully affect the service to the public by other public utilities, that the person acquiring said franchise or control thereof is fit, willing and able to perform such service to the public under said franchise, and that the service under said franchise has been continuously offered to the public up to the time of filing said application[.] (Emphasis added.)
This is the sole provision within the whole of section 62-111 that incorporates language pertaining to "adversely affect the service to the public." It is plain that our Legislature in adopting G.S. § 62-111(e) sought through the narrow conditions enumerated therein to further effect the policy of the State, as declared in the Public Utilities Act of 1963, of favoring transfers of actively operated motor carrier franchises without undue restraint. Utilities Comm. v. Express Lines, 33 N.C.App. 99, 234 S.E.2d 628 (1977) (and cases cited therein). This reflects our Legislature's cognizance of the highly competitive nature of the motor carrier industry, see Utilities Comm. v. Petroleum Carriers, 7 N.C.App. 408, 173 S.E.2d 25 (1970), which is an altogether different circumstance from that obtaining in the case of water and sewer franchises where competition is nonexistent by virtue of the legal monopoly granted to such franchises. Significantly, we observe that the so-called "adverse effect" test argued for by R.I.M. is not itself a test at all but merely a component of the five-part test set forth in G.S. § 62-111(e). Thus, while a determination that a proposed transfer will not adversely affect service to the public is a necessary condition for satisfying the narrow standard under G.S. § 62-111(e), it plainly is not a sufficient condition for satisfying that statutory provision. A fortiori, such a determination cannot be a sufficient condition for satisfying the far broader public convenience and necessity test under G.S. § 62-111(a). We therefore discern no intent on the part of the Legislature that the so-called "adverse effect" test be applied, as the ultimate standard of approval, under the public convenience and necessity inquiry pursuant to G.S. § 62-111(a).
Nor is R.I.M.'s reliance on Carolina Coach availing. That case, involving the transfer of a motor carrier franchise, was decided under G.S. § 62-111(a), prior to the enactment of G.S. § 62-111(e). See Petroleum Carriers, supra. If anything, the subsequent amendment of G.S. § 62-111 to add subpart (e) more clearly reflects the Legislature's intent to create a separate test, applicable only to transfers of franchises within the highly specialized class of utilities made up of motor carriers. Carolina Coach is thus not apposite to transfer approval proceedings of water and sewer franchises.
Consequently, we cannot agree with R.I.M. that the "adverse effect" inquiry *115 is properly applied as the ultimate standard to proposed transfers of water or sewer franchises. Were it otherwise, a bad operator, providing poor service at questionable rates to a captive public, could transfer his franchiseand perhaps profit from his own misdeedssimply upon a showing that the proposed transfer would not make bad matters worse. We cannot believe that the General Assembly intended that the public be thus held hostage. Instead, we are persuaded, and we so hold, that G.S. § 62-111(e) is inapplicable to transfer approval proceedings involving water and sewer franchises. We further hold that when the Commission is adjudging public convenience and necessity in the context of proposed transfers of water and sewer franchises under G.S. § 62-111(a), it must inquire into all aspects of anticipated service and rates occasioned and engendered by the proposed transfer, and then determine whether the transfer will serve the public convenience and necessity. This comports with the long-standing principle that the public convenience and necessity doctrine "is a relative or elastic theory rather than an abstract or absolute rule [and] [t]he facts in each case must be separately considered." Utilities Comm. v. Casey, 245 N.C. 297, 96 S.E.2d 8 (1957).
In making this inquiry, the question of whether the transfer will adversely affect service to the public is thus not the ultimate question, but rather a threshold question. However, we hasten to emphasize that, although G.S. §§ 62-111(a) and 62-111(e) may share in common some of the same elements which must be satisfied in order to meet those tests, we do not view the narrow standard of the five-part test in G.S. § 62-111(e) as setting forth a condition precedent which must be satisfied before proceeding to the public convenience and necessity analysis under G.S. § 62-111(a). Instead, the plain language of G.S. § 62-111(e) unambiguously indicates the intent of the Legislature for that section to operate as a separate and distinct test, applying only to transfers of motor carrier franchises. See also Petroleum Carriers, supra. That the broader public convenience and necessity test necessarily subsumes under it some of the same elements does not alter this fact.
Clearly, had the Commission actually applied the "adverse effect" standard set forth in G.S. § 62-111(e) as the ultimate standard in this case, we would be compelled to reverse. Our careful examination of the Commission's order persuades us, however, that the Commission adequately inquired into and properly resolved the questions of whether R.I.M. could provide adequate, reliable service, and whether the transfer would occasion or engender a change in rates. Accordingly, we reject the Village's contention that the Commission incorrectly applied the public convenience and necessity test under G.S. § 62-111(a).[2]

B. "Fit, Willing and Able" Under the Public Convenience and Necessity Test of G.S. § 62-111(a).
The Village also argues that the Commission erred in finding R.I.M. "fit, willing, and able" to operate and improve the utility franchises in question. This, of course, is a condition of approval set forth in G.S. § 62-111(e) pertaining to transfers of motor carrier franchises. See supra. It is *116 also a relevant question under the separate public convenience and necessity test of G.S. § 62-111(a).
The record shows that the Commission, after hearing extensive evidence pro and con, found R.I.M. to be "fit, willing and able" to operate and improve these franchises. The Commission made sufficient findings and conclusions to properly resolve these issues. We recognize that there were evidentiary gaps and that the Commission could have made further inquiry into this question. Nevertheless, there is competent, material, and substantial evidence in the record to support this finding of the Commission. Accordingly, we are bound thereby. Utilities Comm. v. Thornburg, 314 N.C. 509, 334 S.E.2d 772 (1985).

C. Prior Approval Under G.S. § 62-111(a).
The most disturbing aspect of this case is the suggestion in the Commission's order that transfers of utility franchises can be made contingent upon or subject to Commission approval. The Village vigorously argues that the Commission erred in failing to follow the law set out in G.S. § 62-111(a) requiring prior approval to transfer a utility franchise.[3] R.I.M., however, contends that the statute, in accordance with the Commission's own interpretation, permits completion of transfers contingent upon Commission approval.
G.S. § 62-111(a) plainly requires that "[n]o franchise ... shall be sold, assigned, pledged, or transferred ... except after application to and written approval by the Commission[.]" (Emphasis added.) We flatly reject any suggestion that the statute permits the completion of transfers contingent upon or subject to Commission approval. Such a proposition plainly flies in the face of the clear wording of the statute.
We recognize that before a proposed transfer can become ripe for consideration by the Commission, there must be an agreement to transfer; i.e., the owner of the franchise and the proposed buyer must have reached agreement on the terms and conditions of the transfer or acquisition. But the actual transfer of assets or operational control may never precede the Commission's written approval. This requirement, imposed by the General Assembly, is based on the sound rationale that, if such a change of control and assets were effected before approval has been granted, the Commission would then be placed in the wholly untenable position of having to nullify a de facto transfer as part of the approval proceedings, if the public convenience and necessity so required. The risk of disruption to the public and the practical problems posed by such a circumstance are obvious. Franchise assets could be encumbered, franchise operations and control assumed by the transferee, and the transferor thereafter dissolvedall before the Commission has given its approval to such transfer, and all under the guise that no transfer has actually taken place because the transaction has not been "legally consummated" in that it was contingent upon or subject to Commission approval. The statute may not be so circumvented. Our Legislature, by the unambiguous terms of the statute, clearly intended to prohibit such de facto transfers of franchises before the Commission has had the opportunity to pass upon the merits of the transfer under the public convenience and necessity test.
It is manifest on the face of the record that the parties to the transfer in this case have violated the clear requirement of G.S. § 62-111(a). In the period following the execution of the purchase agreement, and prior to the Commission's order of approval, Pinehurst Enterprises clearly operated these franchises, not as an independent utility, but as agent for R.I.M. *117 The profits generated by such operation were deposited in R.I.M.'s bank account. Moreover, assets of Pinehurst Enterprises were pledged to secure financing for R.I.M. Most disconcerting, the Commission was plainly aware of these circumstances.
R.I.M., however, contends that no violation occurred because "the parties agreed to mechanisms to facilitate returning to the status quo ante " in the event Commission approval was not given. This contention, of course, is premised upon the recognition that a de facto transfer was contemplated by the purchase agreement, that such a transfer would be operative until the Commission issued its ruling, and that such a transfer indeed had occurred. R.I.M. further urges that it had no enforceable property rights in the assets of Pinehurst Enterprises because Commission approval was a condition precedent both under the agreement and the statute. This assertion plainly begs the question. Commission approval is a condition precedent to a lawful transfer under the statute. It is inescapable, however, that these partiesin every aspect of their course of dealingtreated Commission approval as a condition subsequent, to the effect that an unlawful, de facto transfer occurred. The cold record cannot be contradicted by the facile argument that the purchase agreement was unenforceable until the Commission issued its approval of the transfer. The actions of Pinehurst Enterprises and R.I.M. in this case violated G.S. § 62-111(a) in that a transfer and pledging of the assets, ownership, and control of these franchises occurred before the Commission issued its written approval.
Nevertheless, we are constrained to conclude that the Commission did not commit reversible error in this instance. As we noted above, the Commission satisfied the public convenience and necessity inquiry in approving this transfer. The Commission's error in concluding that the transfer in this case complied with the prior approval requirement of G.S. § 62-111(a) therefore does not prejudice the Village. However, we admonish the Commission that lawful transfers of ownership and control cannot be made contingent upon or subject to Commission approval. The law clearly requires prior approval. In emergency situations, the Commission can issue temporary or interim orders giving conditional or temporary approval of operational control. But the Commission should never allow itself to be put in the position of having to undo a "done" deal where the public convenience and necessity might require it.

III. EX PARTE COMMUNICATIONS UNDER G.S. § 62-70
The Village next asserts that the Commission conducted unlawful proceedings upon the Village's motion for interlocutory injunctive relief. G.S. § 62-70 provides in pertinent part:
(a) In all matters and proceedings pending on the Commission's formal docket, with adversary parties of record, all communications or contact of any nature whatsoever between any party and the Commission or any of its members, or any hearing examiner assigned to such docket, whether verbal or written, formal or informal, which pertains to the merits of such matter or proceeding, shall be made only with full knowledge of, or notice to, all other parties of record. All parties shall have an opportunity to be informed fully as to the nature of such communication and to be present and heard with respect thereto.
The record discloses that on 30 September 1988, the Village filed with the Commission a motion for an interlocutory and permanent stay order, grounded on allegations that profits from the franchise operations were being unlawfully diverted to proposed transferee, R.I.M., prior to Commission approval of the transfer. Hearing on this motion was scheduled for 7 October 1988. On 4 October 1988, the Village's subpoena duces tecum issued summoning John Karsig, Jr., controller of Pinehurst Enterprises and president of R.I.M., to testify and present documents at the hearing. R.I.M. filed, inter alia, motions to quash and for a protective order on 6 October 1988.
*118 At the hearing, the Village moved that Mr. Karsig be called to give testimony, which motion was denied upon R.I.M.'s objection. After the conclusion of the hearing, R.I.M., by hand-delivered letter, filed with the Commission John Karsig's affidavit. By its order entered 18 October 1988, the Commission denied the Village's motion for interlocutory injunctive relief, rescheduled the hearing on the Village's motion for permanent injunctive relief, and deferred ruling on R.I.M.'s motions to quash and for a protective order. The Commission's order provides, in pertinent part:
On October 7, 1988, after the hearing had been concluded, RIM filed the affidavit of John Karsig, Jr. The cover letter to which the affidavit was attached stated that Mr. Karsig's affidavit was inadvertently omitted from RIM's Reply to the Motion of the Village of Pinehurst. In issuing this Order, the Commission has also considered the Reply of RIM and the affidavit of Mr. Karsig. (Emphasis added.)
. . . . .
This Order denying motion for interlocutory restraining order does not, however, foreclose further investigation into the merits of the allegations of the Village at the hearing on the permanent injunction.
Accepting arguendo the appearance of impropriety in this aspect of these proceedings, we cannot conclude that such redounded to the prejudice of the Village. The record shows that the Village had actual notice of the late-filed affidavit. It is unclear, both from the record and from the Village's argument in the brief, whether the Village was denied an opportunity to be heard with respect to the late-filed affidavit before the Commission's order was entered. Moreover, a prehearing conference on the Village's motion for a permanent stay order was held on 14 November 1988. The Village advances no contention that it was not afforded an opportunity to be heard with respect to the late-filed affidavit at that time. Nevertheless, we caution the Commission that the requirements of G.S. § 62-70 are explicit.

IV. THE VALIDITY OF THE PRIOR CONSENT JUDGMENT
Finally, we address the Village's challenge to the Commission's conclusion that the sale of Pinehurst Enterprises to R.I.M. was not barred by the consent judgment of 3 December 1973. The question of the validity of the consent judgment was decided by this Court in the companion case of Village of Pinehurst v. Regional Investments of Moore, 97 N.C.App. 114, 387 S.E.2d 222 (1990). There, we held that the consent judgment was void as being violative of the rule against perpetuities. This precedent is binding, and we therefore reject this argument.

V. CONCLUSION
In sum, this appeal presents disturbing questions concerning transfer approval proceedings before the Utilities Commission. For the reasons stated, however, we are constrained to conclude that the Commission did not commit reversible error under the standards of G.S. § 62-94. The order of the Commission approving the transfer therefore must be and is
Affirmed.
COZORT and LEWIS, JJ., concur.
NOTES
[2] We further note, that although the Commission considered the question of the Village's suitability to operate these franchises to be irrelevant, it nevertheless went on to determine that the Village had not substantiated its claim that it would be a more suitable operator. It is undeniable that the intervention of the Village in these proceedings is predicated on its status as a potential purchaser, "waiting in the wings" as a competing buyer of these franchises. Such status, however, does not render the question of whether the Village could provide better service at better rates than R.I.M. irrelevant in these transfer proceedings. On the contrary, the question of whether another potential purchaser of a water or sewer franchise can provide better service is plainly relevant under the broad public convenience and necessity test of G.S. § 62-111(a). But equally plainly, such a showing would not of itself be dispositive of the issue of whether approval should be granted. When weighing the broad aspects and implications of public convenience and necessity, the Commission is cloaked with wide discretion and is not required to reject an application for transfer merely because another potential purchaser produces evidence that it might be able to do a better job.
[3] The Village also contends that the Commission erred in failing to properly apply G.S. § 62-161 prohibiting issuance of securities without prior approval of the Commission. Our discussion of the questions raised regarding prior approval under G.S. § 62-111(a) applies with equal force to the issue of prior approval under G.S. § 62-161. We therefore deem it unnecessary to address this issue separately.