STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; AND CAROLINA WATER SERVICE, INC. OF NORTH CAROLINA, APPLICANT APPELLEES v. PUBLIC STAFF—NORTH CAROLINA UTILITIES COMMISSION, INTERVENOR APPELLANTS

No. COA95-27

(Filed 2 July 1996)

## Utilities § 51 (NCI4th)— sale of private utility to municipal system—distribution of gain—issues regarding future policy not before Court

Findings and conclusions supported the Utilities Commission's decision that a public utility should retain 100% of the gain on sale of two water systems, instead of splitting the gain between shareholder and customers, since evidence showed that a policy of equal splitting would result in a higher purchase price or might result in the sale being called off; beneficial transfers of privately held utilities to municipal systems had been hampered by a policy of splitting gain on sale; and assigning 100% of the gain to the shareholder would encourage the private utility to make further investments in other smaller water systems, some of which may be undercapitalized or poorly run. The issue of whether the Commission's new policy concerning the future assignment of gain or loss upon the sales of water and/or sewer utilities complied with due process was not before the Court of Appeals.

**Am Jur 2d, Public Utilities §§ 9 et seq.**

Appeal by intervenor-appellant from orders entered 7 September 1994 and 14 November 1994 by the North Carolina Utilities Commission. Heard in the Court of Appeals 5 October 1995.

Applicant-appellee Carolina Water Service, Inc. of North Carolina (CWS), a duly franchised public utility, owns numerous water and sewer systems in North Carolina. On 18 November 1993 and 16 February 1994 respectively, CWS filed applications with the North Carolina Utilities Commission (the Commission) to relinquish CWS' certificates of public convenience and necessity to provide water for the Farmwood B and Chesney Glen service areas and to transfer its utilities assets for these systems to the Charlotte-Mecklenburg Utility Department (CMUD). Additionally, CWS requested the Commission allow CWS' sole shareholder, Utilities, Inc., to keep 100 percent of the gain on the sale of the two systems. Intervenor-appellant Public Staff—North Carolina Utilities Commission (Public Staff) filed a motion for a hearing before the full Commission on CWS' applications.

The Commission consolidated the two applications and conducted a public hearing on 7 June 1994. All sides agreed the transfer of the two systems to CMUD would be in the best interests of the ratepayers within those systems because of increased service and lower rates. The sole contested issue was how the gain on sale of the systems would be distributed. Public Staff argued the gain should be equally divided between CWS' shareholder and CWS' remaining ratepayers in accordance with the policy for gain splitting previously adopted by the Commission. Public Staff contended CWS' remaining ratepayers should be entitled to share in any gain on the sales through a "gains follows risk" or "economic benefit follows economic burden" analysis because: (1) the remaining ratepayers had helped to maintain the systems through previous payment of their water bills, and (2) they also bore the risk of making up for any catastrophic losses to the systems' facilities through the rates they paid. CWS argued that a policy of splitting the gain on sale served as a disincentive for privately held utilities to sell their systems to municipal utilities, even though such sales would be beneficial to the ratepayers within the systems.

The Commission granted a motion by CWS, which Public Staff did not oppose, to sever the issue of transfer of the systems from the issue of treatment of gain on sale. Thereafter, the Commission entered an order approving the sales on 6 July 1994. On 7 September 1994 the Commission issued an order determining that 100 percent of the gain on sale of the two systems should be assigned to CWS' shareholder. Further, the Commission held that in the future, absent overwhelming and compelling evidence to the contrary, it would follow a policy of assigning 100 percent of the gain or loss on the sale of water and sewer systems to utility company shareholders.

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[123 N.C. App. 43 (1996)]

Public Staff filed notice of appeal and a motion for reconsideration by the Commission. The Commission entered an order dated 14 November 1994 which denied Public Staff's motion for reconsideration and reaffirmed the 7 September 1994 order. Public Staff also filed a notice of appeal to the 14 November order. From the orders allowing CWS' shareholder to retain 100 percent of the gain on sale of the Farmwood B and Chesney Glen water systems and announcing the Commission's future policy regarding assignments of gain and loss, Public Staff appeals.

*Hunton & Williams, by Edward S. Finley, Jr. and James L. Hunt, for applicant-appellee Carolina Water Service, Inc. of North Carolina.*

*Public Staff, Robert P. Gruber, Executive Director, by Antoinette R. Wike, Chief Counsel, and Paul L. Lassiter, Staff Attorney, for intervenor-appellant Public Staff—North Carolina Utilities Commission.*

McGEE, Judge.

The only statutory grounds argued by Public Staff in its brief for reversing the decision to assign 100 percent of the gain from the sales of the two systems to CWS' shareholder are that the order was arbitrary and capricious and not supported by competent, material and substantial evidence. Further, Public Staff argues the Commission's announcement that in the future it would assign 100 percent of the gain or loss on the sale of utilities to the utility shareholders violated due process. However, as set forth below, this last issue is not properly before us. After reviewing the record, we affirm the order of the Commission.

On appeal, a rate decision, rule, regulation, finding, determination, or order made by the Commission is deemed prima facie just and reasonable. N.C. Gen. Stat. § 62-94(e). "[J]udicial reversal of an order of the Utilities Commission is a serious matter for the reviewing court which can be properly addressed only by strict application of the [statutory] criteria which circumscribe judicial review." *Utilities Comm. v. Oil Co.*, 302 N.C. 14, 20, 273 S.E.2d 232, 235 (1981). Appellate review of an order of the Commission is governed by subsections (b) and (c) of N.C. Gen. Stat. § 62-94. *State ex rel. Utilities Comm. v. Southern Bell*, 88 N.C. App. 153, 165, 363 S.E.2d 73, 80 (1987). "[W]here the Commission's actions do not violate the Constitution or exceed statutory authority, appellate review is limited

to errors of law, arbitrary action, or decisions unsupported by competent, material and substantial evidence." *Utilities Comm. v. Springdale Estates Assoc.*, 46 N.C. App. 488, 494, 265 S.E.2d 647, 651 (1980). In determining whether to uphold the Commission's actions, the appellate court shall review the whole record. N.C. Gen. Stat. § 62-94(c). When applying the whole record test, the court may not replace the Commission's judgment with its own when there are two reasonably conflicting views of the evidence. *See White v. N.C. Dept. of E.H.N.R.*, 117 N.C. App. 545, 547, 451 S.E.2d 376, 378, *disc. review denied*, 340 N.C. 263, 456 S.E.2d 839 (1995).

Public Staff argues the Commission incorrectly determined that it was in the best interest of the consuming public to implement a policy whereby 100 percent of the gains and losses on sale will be distributed to utility shareholders. Public Staff contends the better policy would be to allow ratepayers who share the risk of loss to also share in capital gains upon the sale of utilities. However, it is not and should not be this Court's role to determine the merits of policy positions adopted or rejected by the Commission. "[The reviewing court's] statutory function is not to determine whether there is evidence to support a position the Commission did not adopt. We ask, instead, whether there is substantial evidence, in view of the entire record, to support the position the Commission *did* adopt." *State ex rel. Utilities Comm. v. Eddleman*, 320 N.C. 344, 355, 358 S.E.2d 339, 347 (1987). The General Assembly has given the Commission, not the courts, the authority to regulate the operations of public utilities. N.C. Gen. Stat. § 62-2. Therefore, if the findings and conclusions of the Commission are supported by competent, substantial and material evidence, this Court must affirm the decision even if we might have reached a different determination upon the evidence. *Utilities Comm. v. Telephone Co.*, 281 N.C. 318, 336-37, 189 S.E.2d 705, 717 (1972).

Public Staff contends the Commission's order is not supported by competent, substantial, and material evidence and is arbitrary and capricious. We disagree. When addressing a question of the sufficiency of the evidence, this Court has described the proper standard of review from a decision of the Commission as follows:

[T]he Commission's order [is] to be affirmed if, upon consideration of the whole record as submitted, the facts found by the Commission are supported by competent, material and substantial evidence, taking into account any contradictory evidence or

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[123 N.C. App. 43 (1996)]

evidence from which conflicting inferences could be drawn. "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Springdale Estates,* 46 N.C. App. at 490-91, 265 S.E.2d at 649 (citations omitted). Upon review of the whole record, we find it contains relevant evidence which "a reasonable mind might accept as adequate" to support the Commission's decision.

To support its decision, the Commission made, among others, the following findings and conclusions:

Events occurring since the Commission initially established its gain splitting policy in 1990 indicate that such policy, contrary to the public interest, serves as a disincentive to sell and may thereby discourage and impede beneficial sales to municipal and other government-owned entities. . . .

CWS provided evidence that shows that action has been taken in response to the Commission's decision in past dockets to split the gain that is harmful to the public interest and that such developments exemplify why the Commission's gain splitting policy can be detrimental and should be revised. CWS states further that through written statements in the past Orders, upon which the Public Staff relies, certain members of the Commission have questioned the wisdom and appropriateness of the past decisions to equally split gains. Through these written statements, those Commissioners have suggested that the issue should be revisited and that the ramifications to the public good of the decision to split the gains should be taken into account. Based on those statements, CWS argues that the Public Staff's reliance on the past holdings equally splitting gains is inappropriate and not in the public interest.

With the benefit of hindsight, the Commission can now see that the policy to split gains or losses on sales of water and/or sewer systems has had a negative impact on the public good. For example, the proposed sale of the Beatties Ford system from CWS to CMUD in 1990 was renegotiated after this Commission ruled to split the gain. That resulted in the Charlotte-Mecklenburg taxpayers and ratepayers spending more on the acquisition of the Beatties Ford system than they would have spent if this Commission's ruling had been to flow the gain to stockholders only. Furthermore, the Farmwood "B" contract between CWS and

CMUD contains a provision wherein the price to CMUD escalates in proportion to the portion of any gain that is flowed to CWS's remaining customers. In addition, all involved parties know that CWS chose not to sell its Riverbend utility system as a result of the Commission's ruling in Docket No. W-354, Sub. 88.

These facts, consequences of the Commission's decisions in the prior CWS and [Heater Utilities, Inc. ("Heater")] dockets, suggest that the Commission's gain splitting policy is contrary to the public interest. A policy of gain splitting for sales of water and/or sewer systems may undermine the achievement of economies of scale and encourage inefficient operations. That result is clearly not in the public interest. Moreover, with respect to Beatties Ford, the sales price for Beatties Ford, paid from public funds, was artificially increased. The sales price for [the Genoa subdivision water system] was reduced to the detriment of CWS. The beneficial sale of [the Riverbend subdivision water system] to [the City of] New Bern fell through. None of those harmful consequences would have taken place but for the Commission's decision to split the gain. On balance, the marginal benefit to remaining ratepayers of the gain splitting policy is outweighed by the harmful consequences of such policy. . . . [T]he Commission should not impose economic barriers to the orderly transfer of water systems to municipal entities, as was inadvertently done in the Riverbend situation.

If economic incentives are removed so that this succession of ownership becomes inadvisable, customers are denied those benefits. If companies like CWS are prevented from retaining the gain on sale in North Carolina, a substantial incentive is removed for those companies to buy systems from developers or small, undercapitalized operators in the first instance. Likewise, a substantial incentive is removed to negotiate to sell systems to municipal or governmental entities. At a minimum, the sale price is artificially increased above the fair market based price to adjust for the payment of part of the gain to customers. The result is harm to consumers because the natural progression of transfer of ownership to the most efficient provider is disrupted. These harmful consequences are clearly not in the public interest. . . .

The detrimental effect of the Commission's gain splitting policy as it pertains to the sale of water and/or sewer systems is reflected in the transactions at issue in this case. The purchase

STATE ex rel. UTILITIES COMM. v. PUBLIC STAFF

[123 N.C. App. 43 (1996)]

price for the Farmwood "B" system increases by $58,000 if the Commission requires CWS to split 50% of the gain with the remaining [ratepayers.] This is an added taxpayer expense that is inconsistent with the public interest. It appears that this provision would not have been included in the CWS-CMUD contract except in response to the Commission's gain splitting policy.

These findings and conclusions support the Commission's decision that CWS should retain 100 percent of the gain on sale of the water systems, and we determine that the record contains substantial, material, competent evidence to support the findings.

The order states these findings were based on evidence "found in the applications and the testimony of [CWS] witness Daniel and Public Staff witnesses Rudder and Fernald." Carl Daniel, vice president of CWS, testified that a policy of splitting the gain on sale acted as a disincentive for privately held utilities to sell facilities to municipalities. Daniel testified this adversely impacted consumers because additional public funds would have to be expended. If CWS did not sell its facilities, CMUD, whose charter requires it to provide service to Farmwood B and Chesney Glen, would be forced to incur the additional expense of completely duplicating the existing facilities. Customers would have to pay tap-on fees of several thousand dollars to fund these duplication costs. Daniel also testified customers benefit by transferring to a municipal utility because of better fire protection, lower homeowners insurance premiums, better system reliability, lower usage rates, and improved water taste. He further testified that a policy of allowing the shareholder to keep 100 percent of the gain on sale would encourage CWS to continue to purchase smaller utility companies that may be having problems in serving their customers. Daniel also testified, and the record contains a copy of the contract, that CMUD's purchase price for the Farmwood B system would be $58,000 higher if the Commission allowed CWS to retain only 50 percent of the gain on sale as opposed to 100 percent.

Katherine Fernald, water supervisor in the accounting division of Public Staff, testified on cross-examination that CWS negotiated a higher price with CMUD for its Beatties Ford facilities and that a deal to sell the Riverbend system to the City of New Bern fell through after the Commission announced its policy of splitting gains between the shareholder and ratepayers. Fernald testified the ratepayers within the Riverbend system wanted the system sold and preferred to have service provided by a municipality. She also testified that by selling

facilities, CWS reduces its customer base and loses economies of scale.

We conclude that a reasonable mind would regard the testimony of Daniel and Fernald, along with the other materials contained in the record, to adequately support a conclusion that the best interests of the public would be served by allowing CWS to keep 100 percent of the gain on sale of the Farmwood B and Chesney Glen systems. The evidence showed a policy of equally splitting gains on sale would result in a higher purchase price for the Farmwood B system, causing a greater burden for Charlotte-Mecklenburg taxpayers. Also, the contract stated that if CWS was required to share more than 50 percent of the gain with the ratepayers, then the sale could be called off. The evidence also showed the beneficial transfers of privately held utilities to municipal systems had been hampered by a policy of splitting gain on sale. In this case, if CWS had refused to sell the facilities, CMUD would have been forced to duplicate the existing facilities at a high cost. Further, a policy of assigning 100 percent of the gain to the shareholder encourages CWS to make further investments in other smaller water systems, some of which may be undercapitalized or poorly run.

We also disagree with Public Staff's contention that the Commission's order was arbitrary and capricious.

The arbitrary and capricious standard is a difficult one to meet. Agency actions have been found to be arbitrary and capricious when such actions . . . "indicate a lack of fair and careful consideration; [and] when they fail to indicate 'any course of reasoning and the exercise of judgment.' "

*White,* 117 N.C. App. at 547, 451 S.E.2d at 378 (citations omitted). Here, a review of the order and record shows the Commission gave fair and careful consideration to the issues before it, and that the Commission's final decision was the product of reasoning and the exercise of its judgment.

We agree with Public Staff that several of the Commission's findings and conclusions appear to be improperly based upon the Commission's knowledge of events and evidence outside of this record. *See Utilities Commission v. Coach Co.,* 261 N.C. 384, 391, 134 S.E.2d 689, 695 (1964) ("[T]he Commission's knowledge, however expert, cannot be considered by us on appeal unless the facts embraced within that knowledge are in the record."). Also, the Public

STATE EX REL. UTILITIES COMM. v. PUBLIC STAFF

[123 N.C. App. 43 (1996)]

Staff's argument that the record needed additional evidence on certain issues is well taken. For example, although one could conclude that the higher renegotiated price for the Beatties Ford System and the failure to complete the Riverbend sale directly resulted from the Commission's gains splitting policy, the record contains no direct testimony or evidence that the policy was the sole cause of these changes nor any evidence concerning whether other circumstances may also have been involved. However, we find the evidence that is contained in the record to be sufficient to support the Commission's order that CWS retain all of the gain on sale of the Farmwood B and Chesney Glen systems.

Lastly, Public Staff assigns as error the Commission's statement that "[I]n future proceedings, the Commission will follow a policy, absent overwhelming and compelling evidence to the contrary, of assigning 100% of the gain or loss on the sale of water and/or sewer utility systems to utility company shareholders." However, this issue is not properly before this Court and we need not decide it.

Public Staff argues the Commission violated due process by announcing this policy without holding a hearing before all interested parties. However, Public Staff cited no authority for this proposition and this argument is deemed abandoned. N.C.R. App. P. 28(b)(5). Further, an appellate court will not consider constitutional questions, such as a violation of due process, when they are "not necessary to the decision of the precise controversy presented in the litigation before it." *Nicholson v. Education Assistance Authority*, 275 N.C. 439, 447, 168 S.E.2d 401, 406 (1969). By its language, the policy pronouncement complained of by Public Staff applies to future cases before the Commission. It is prospective in nature and had no bearing upon this case. As such, the issue is not ripe for determination. Therefore, we decline to decide whether the Commission's new policy concerning the future assignment of gain or loss upon the sales of water and/or sewer utilities complies with due process.

For the reasons stated, the order of the Commission is affirmed.

Affirmed.

Judges MARTIN, John C., and JOHN concur.