IN THE MATTER OF: PETITION OF UTILITIES, INC., FOR TRANSFER OF THE CERTIFICATE N.C. UTILITIES COMMISSION OF PUBLIC CONVENIENCE AND NECESSITY FOR PROVIDING SEWER UTILITY SERVICE ON NORTH TOPSAIL ISLAND AND ADJACENT MAINLAND AREAS IN ONSLOW COUNTY FROM NORTH TOPSAIL WATER AND SEWER, INC., AND FOR TEMPORARY OPERATING AUTHORITY

No. COA00-606

(Filed 20 November 2001)

**1. Utilities— certificate of public convenience and necessity—operation of sewage treatment facilities—operational and managerial trouble**

The North Carolina Utilities Commission did not err in its order granting Utilities, Inc.'s application under N.C.G.S. §§ 62-111(a) and 62-116 to acquire the certificate of public convenience and necessity for operation of the pertinent sewage treatment facility by concluding that the sewage treatment facility was not an operationally and managerially troubled utility, because: (1) all of the Commission's findings on this issue were supported by the testimony of customers at the hearings to the effect that service by the current management under the supervision of the Commission was satisfactory; and (2) the only operational violations found by the Commission occurred during the period of prior management.

**2. Utilities— certificate of public convenience and necessity—operation of sewage treatment facilities—acquisition adjustment**

The North Carolina Utilities Commission did not err in its order granting Utilities, Inc.'s (UI) application under N.C.G.S.

**IN RE PETITION OF UTILS., INC.**

[147 N.C. App. 182 (2001)]

§§ 62-111(a) and 62-116 to acquire the certificate of public convenience and necessity for operation of the pertinent sewage treatment facility by denying UI's request to include the purchase price for the sewage treatment facility in the rate base and by failing to give adequate weight to the alleged harmful conduct of the prior owners, because: (1) the Commission pointed out that it is incumbent on the hearing examiner to look at each acquisition adjustment on a case-by-case basis; (2) the Commission observed that a majority of regulatory agencies had not allowed the acquisition adjustment to be reflected in rate base; and (3) the Commission weighed all the evidence bearing upon its articulated standard and determined UI had failed to carry its burden.

3. **Utilities— certificate of public convenience and necessity—operation of sewage treatment facilities—connection fees**

The North Carolina Utilities Commission did not err in its order granting Utilities, Inc.'s (UI) application under N.C.G.S. §§ 62-111(a) and 62-116 to acquire the certificate of public convenience and necessity for operation of the pertinent sewage treatment facility by reducing connection fees in the instant transfer proceeding under N.C.G.S. § 62-111 without complying with the general rate case procedures established under N.C.G.S. § 62-133, because: (1) UI did not preserve this issue for appellate review by failing to object, and UI is estopped from asserting on appeal a position contrary to that advanced before the Commission; and (2) the Commission determined that the issue of connection fees was appropriate in the instant proceeding and that a general rate case was not required.

Appeal by Utilities, Inc. from order entered 6 January 2000 by the North Carolina Utilities Commission. Heard in the Court of Appeals 26 March 2001.

*Hunton & Williams by Edward S. Finley, Jr. for appellant Utilities, Inc.*

*Public Staff Legal Division by James D. Little, Staff Attorney for appellee Public Staff—North Carolina Utilities Commission.*

*Attorney General Michael F. Easley, by Assistant Attorney General Margaret A. Force for appellee Attorney General.*

**IN RE PETITION OF UTILS., INC.**

[147 N.C. App. 182 (2001)]

JOHN, Judge.

Utilities, Inc. (UI), appeals a 6 January 2001 order (the Order) of the North Carolina Utilities Commission (the Commission) granting UI's application pursuant to N.C.G.S. §§ 62-111(a) (1999) and 62-116 (1999) to acquire the certificate of public convenience and necessity for operation of the sewage treatment facilities of North Topsail Water and Sewer, Inc. (North Topsail) in Onslow County. UI challenges certain provisions of the Order. We affirm the Commission.

Pertinent procedural and factual background information includes the following: From 1981 to 1994, North Topsail had been owned and operated in the Topsail Beach and Sneads Ferry area of Onslow County by developers Marlow Bostic (Bostic) and Roger Page (Page). During that time, North Topsail repeatedly failed to meet its public utility responsibilities and the developers engaged in multiple improper and fraudulent actions. By 1994, the system had become degraded, North Topsail was subject to numerous judgments and other debts, the state had imposed environmental penalties, and the accounting of funds was deficient. As a consequence, the Commission intervened, removed Bostic from active management, and appointed a manager directly responsible to the Commission.

Subsequently, Bostic filed personal bankruptcy, including ownership of fifty percent of the corporate stock of North Topsail among his assets. In 1999, UI filed a bid to purchase North Topsail with the federal bankruptcy court, which bid contained no acquisition adjustment allowing rate base treatment of the purchase price. Rate base is the capital investment upon which a public utility is permitted to earn a rate of return or profit.

UI subsequently entered into a 7 May 1999 Asset Purchase Agreement (the Agreement) with the bankruptcy trustee for acquisition of the sewer assets of North Topsail for $2.7 million, subject to "Court Approval" and "Regulatory Consent." The sale included conveyance of the fifty percent interest of Page. "Court Approval" was obtained in consequence of an "Order Approving Sale" issued 11 June 1999 by the bankruptcy court.

"Regulatory Consent" was defined in the Agreement as "consent of the [] Commission and its Public Staff to the sale contemplated hereunder." On 23 June 1999, UI petitioned the Commission for approval of the purchase and acquisition of the requisite certificate of

**IN RE PETITION OF UTILS., INC.**

[147 N.C. App. 182 (2001)]

public convenience and necessity to operate the sewage treatment facilities of North Topsail. UI also sought permission to include the $2.7 million purchase price within its rate base.

Following evidentiary hearings conducted 30 September and 12 October 1999 (the hearings), the Commission issued its 6 January 2000 Order authorizing transfer of the certificate, but denying rate base treatment of the purchase price. Included in the Commission's thorough and detailed Order were the following findings of fact:

53. Although [North Topsail] is a financially-troubled utility, there are no serious operational problems currently affecting the system. The sewer system is currently being operated in a satisfactory manner.

54. All other things remaining equal, inclusion of the proposed acquisition adjustment in rate base would support a $12.00 per month or 38% increase in [North Topsail's] residential rates.

55. The purchase price of $2.7 million that UI agreed to pay for the North Topsail system, which was established through an arms length bidding process, was prudent.

56. UI is obligated to purchase North Topsail whether the proposed acquisition adjustment is included in rate base or not.

57. Approval of the proposed acquisition adjustment is not in the public interest since the benefits to customers resulting from the allowance of rate base treatment of an acquisition adjustment in this case would not outweigh the resulting burden or harm to customers associated therewith.

58. The proper level of connection fees is $1,200 per residential equivalent unit.

. . . .

63. The transfer of the franchise and assets of [North Topsail] to UI is in the public interest and should be approved.

In addition, the Commission found that the North Topsail sewer collection system was "adequately serving the needs of [its] customers," that no new customer had been denied service, and that the public had expressed no service complaints.

N.C.G.S. § 62-94 (1999) prescribes the scope of appellate review of a decision by the Commission. *State ex rel. Utilities Comm'n. v.*

*Southern Bell Tel. & Tel. Co.*, 88 N.C. App. 153, 165, 363 S.E.2d 73, 80 (1987). According to the section, the reviewing court:

- (b) . . . may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary or capricious.

G.S. § 62-94(b).

Further, on appeal, "a, rule, regulation, finding, determination, or order made by the Commission is deemed *prima facie* just and reasonable." *State ex rel. Utilities Comm'n. v. Public Staff*, 123 N.C. App. 43, 45, 472 S.E.2d 193, 195 (1996); N.C.G.S. § 62-94(e) (1999). The appellate standard of review is whether the Commission's findings of fact are supported by competent, material and substantial evidence. *State ex rel. Utilities Comm'n. v. Nantahala Power & Light Co.*, 313 N.C. 614, 745, 332 S.E.2d 397, 474, *rev'd on other grounds*, 476 U.S. 953, —— L. Ed. 2d —— (1986); N.C.G.S. § 62-94(b)(5). Substantial evidence is defined as

more than a scintilla or a permissible inference. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*State ex rel. Utilities. Comm'n. v. Southern Coach Co.*, 19 N.C. App. 597, 601, 199 S.E.2d 731, 733 (1973). All findings of fact made by the Commission which are supported by competent, material and substantial evidence are conclusive. *State ex rel. Utilities Comm'n. v. Public Staff and Lacy H. Thornburg*, 317 N.C. 26, 34, 343 S.E.2d 898, 903 (1986).

**IN RE PETITION OF UTILS., INC.**

[147 N.C. App. 182 (2001)]

In determining whether to uphold the Commission's actions, the appellate court is to review the whole record. N.C.G.S. § 62-94(c) (1999). In doing so, the court may not replace the Commission's judgment with its own when there are two reasonably conflicting views of the evidence, *State ex rel. Utilities Comm'n. v. Carolina Indus. Group for Fair Utility Rates*, 130 N.C. App. 636, 639, 503 S.E.2d 697, 699-700 (1998), and

> it is for the administrative body . . . to determine whether the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts and to appraise conflicting and circumstantial evidence,

*State ex rel. Utilities Comm'n. v. Thornburg*, 314 N.C. 509, 515, 334 S.E.2d 772, 775 (1985). Finally, the appellate court ". . . may not substitute its judgment, either with respect to factual disputes or policy disagreements, for that of the Commission." *State ex rel. Utilities Commission v. North Carolina Textile Manufacturers Association*, 59 N.C. App. 240, 245, 296 S.E.2d 487, 490 (1982), *rev'd on other grounds*, 309 N.C. 238, 306 S.E.2d 113 (1983).

In order to facilitate appellate review, the Commission must comply with the following statutory provisions:

> (a) All final orders and decisions of the Commission shall be sufficient in detail to enable the court on appeal to determine the controverted questions presented in the proceedings and shall include:

> (1) Findings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record, and

> (2) The appropriate rule, order, sanction, relief or statement of denial thereof.

N.C.G.S. § 62-79(a) (1999). Further, although the Commission need not comment upon every single fact or item of evidence presented by the parties, *Nantahala* at 745, 332 S.E.2d at 474,

> [t]he failure to include all the necessary findings of fact is an error of law and a basis for remand upon N.C.G.S. § 62-94(b)(4) because it frustrates appellate review.

*State ex rel. Utilities Comm'n. v. The Public Staff*, 317 N.C. 26, 34, 343 S.E.2d 898, 904 (1986).

IN RE PETITION OF UTILS., INC.

[147 N.C. App. 182 (2001)]

Bearing the foregoing principles in mind, we now turn to a consideration of UI's assignments of error.

I.

[1] Relying heavily upon the uncontroverted evidence of mismanagement of North Topsail when operated by Bostic and Page, UI first challenges the Commission's finding and subsequent conclusion that North Topsail was not an operationally and managerially troubled utility. UI contends the Commission's determination was not based upon record evidence and was in any event arbitrary and capricious. We do not agree.

The significance of this first issue lies in the requirements that ownership transfer of a public utility serve the public convenience and necessity, *see* G.S. § 62-111(a), and that the Commission inquire into all aspects of anticipated service and rates occasioned and engendered by the proposed transfer, *see State ex rel. Utilities Comm. v. Village of Pinehurst,* 99 N.C. App. 224, 229, 393 S.E.2d 111, 115 (1990).

In addition to the findings noted earlier, the Commission found that the North Topsail system did

> not suffer from the various system deficiencies, ongoing environmental regulatory violations and frequent customer complaints that typify operationally-troubled systems,

and found and concluded that

> the facilities owned and operated by [North Topsail] are in satisfactory condition and are currently sufficient to provide sewer utility service to [its] customers.

We initially reiterate that the Order was most comprehensive and replete with detail. The Commission thereby met the obligations imposed upon it by *Comm'n. v. Public Staff,* 317 N.C. at 34, 343 S.E.2d at 904. Examination of the whole record, *see* G.S. § 62-94(c), moreover, reveals that all the Commission's findings touching upon the first issue were supported by the testimony of customers at the hearings to the effect that service by the current management of North Topsail (under the supervision of the Commission) was satisfactory, the sole problem mentioned being occasional odor from a pumping station, as well as by the testimony of UI's own witness that there were no immediate plans for substantial changes in operation of the system. Indeed, the only operational violations found by the

Commission occurred during the period of management by Bostic and Page, and the record sustains the Commission's observation that "since 1994, [North Topsail] management has operated its facilities in a sound and reasonable manner." The Commission's "not operationally troubled utility" finding was thus supported by competent, material, and substantial evidence, *see Comm. v. Nantahala Power & Light Co.*, 313 N.C. at 745, 332 S.E.2d at 474, is thereby conclusive, *see Comm. v. Public Staff and Lacy Thornburg*, 317 N.C. at 34, 343 S.E.2d at 903, and supports its like conclusion.

As to UI's contention the Order was arbitrary and capricious, we note initially that such a characterization is difficult to sustain. The actions of an administrative agency may be considered arbitrary and capricious only when there is "a lack of fair and careful consideration; [and] when they fail to indicate 'any course of reasoning and the exercise of judgment.'" *White v. N.C. Dept. of E.H.N.R.*, 117 N.C. App. 545, 547, 451 S.E.2d 376, 378, *disc. review denied*, 340 N.C. 263, 456 S.E.2d 839 (1995). In the case *sub judice*, careful review of the record and Order reflects fair and thorough consideration by the Commission of the issues before it, and compels the determination that the Commission's final decision was the product of reasoning and the exercise of judgment. Accordingly, we reject UI's first argument.

## II.

[2] UI next advances what appears to be its primary contention, *i.e.*, that the Commission erred by denying UI's request to include the purchase price for North Topsail in the rate base. According to UI, the Commission "fundamentally altered the standard" applied in prior acquisition adjustment cases. The Commission's "new standard," UI continues, requires the buying utility to show it will create benefits for the ratepayer

> in the period beginning *after the transfer* that are separate and apart from those arising from replacing the old owner and that outweigh the negative rate impact of including the plant acquisition adjustment in rate base.

Thus, UI concludes,

> the acquiring utility must make concessions or promise improvements above and beyond those that accrued to ratepayers by relieving them of the negative features of the erstwhile owner's management that can be quantified and shown to outweigh the

negative rate impact of return on increased investment before rate base treatment of the plant acquisition adjustment can be allowed.

UI also maintains the Commission failed to give adequate weight to the "harmful conduct of Bostic and Page," asserting it "seemed to dismiss this conduct as irrelevant because it did not impact current operations." We consider UI's assertions under its second argument *ad seriatim.*

It appears our appellate courts have not previously addressed the acquisition adjustment issue. In its Order, however, the Commission carefully analyzed its own prior decisions, *see* N.C.G.S. § 62-65 (1999) (Commission may take judicial notice of its opinions), and determined it had not articulated a single, definitive test for resolving acquisition adjustment issues in water and sewer transfer cases. The Commission pointed out its earlier observation that "it is incumbent upon the Hearing Examiner to look at each acquisition adjustment on a case-by-case basis." *In re Carolina Water Service, Inc. of North Carolina (Carolina I),* 76 NCUC Orders and Decisions 739, 755 (1986).

In addition, the Commission set out numerous factors that appeared to have been considered in prior cases:

the prudence of the purchase price paid by the acquiring utility; the extent to which the size of the acquisition adjustment resulted from an arms length transaction; the extent to which the selling utility is financially or operationally 'troubled;' the extent to which the purchase price will facilitate system improvements; the size of the acquisition adjustment; the impact of including the acquisition adjustment in rate base on the rates paid by customers of the acquired and acquiring utilities; [and] the desirability of transferring small systems to professional operators . . .,

none of which, the Commission noted, had been deemed "universally dispositive".

Nonetheless, the Commission, citing treatises on public utility law, observed that a majority of regulatory agencies had not allowed the acquisition adjustment to be reflected in rate base:

most commissions are skeptical of transfers between utilities at excess costs, so rate base adjustments are generally not made unless the utility can demonstrate actual, distinct and substantial

**IN RE PETITION OF UTILS., INC.**

[147 N.C. App. 182 (2001)]

benefits to all affected ratepayers. J Bonbright, A. Danielson, and D. Kamerschen, *Principles of Public Utility Rates* 286 (1987). See also 1 A. Priest, *Principles of Public Utility Regulation* 189 (1969) (although the majority of regulatory commissions have refused to include acquisition adjustments in rate base, such treatment has been allowed where 'the transactions was at arm's length,' 'resulted in operating efficiencies,' 'received regulatory approval as having been in the public interest,' or 'made possible a desirable integration of facilities").

Ultimately, the Commission concluded it was appropriate to articulate a test for identifying the circumstances in which inclusion of acquisition adjustments in rate base might be appropriate. According to the Commission, the "virtually unlimited" number of relevant considerations, some of which have been set out above, all

relate to the question of whether the acquiring utility paid too much for the acquired utility and whether the customers of both the acquired and the acquiring utilities are better off after the transfer than they were before that time.

Accordingly, the Commission adopted an approach, "contrary to [those] advocated by [] UI and the Public Staff," under which the Commission would

refrain from allowing rate base treatment of an acquisition adjustment unless the purchasing utility [has] establishe[d] by the greater weight of the evidence [] that the price the purchaser agreed to pay for the acquired utility was prudent and that both the existing customers of the acquiring utility and the customers of the acquired utility would be better off (or at least no worse off) with the proposed transfer, including rate base treatment of any acquisition adjustment, than would otherwise be the case.

The Commission commented that the foregoing method of analysis was consistent with sound regulatory policy and with the construction of G.S. § 62-111(a) adopted by this Court, that is, that the Commission "must inquire into all aspects of anticipated service and rates occasioned and engendered by the proposed transfer," *Village of Pinehurst*, 99 N.C. App. at 229, 393 S.E.2d at 115. We agree.

Contrary to UI's assertion of a "fundamentally altered standard," the lengthy quotations from the Order quoted above amply reveal that the Commission merely reviewed factors it had previously deemed

relevant as well as those cited by treatises on regulatory law, and then simply articulated a standard incorporating consideration of all such factors. *See id.* Rather than failing to give appropriate weight to the "troubled" aspect of North Topsail, as UI insists, moreover, review of the Order indicates the Commission carefully weighed all the evidence bearing upon its articulated standard and determined UI had failed to carry its burden. Again, it is for the Commission "to determine the weight and sufficiency of the evidence." *Comm. v. Thornburg*, 314 N.C. at 515, 334 S.E.2d at 775.

First, the Commission considered whether the purchase price was prudent. Taking judicial notice that North Topsail was "located in an area which is experiencing or is likely to experience significant growth," the Commission found that a prudent purchaser might well elect to pay more than net book value on the assumption that acquiring the right to operate North Topsail had independent value over and above the net book value of its assets. The Commission also observed that the purchase price had been established in "an arm's length bidding process" in the bankruptcy court and that the price agreed to by UI "was the minimum amount apparently necessary [for it] to prevail" in the bidding. Based upon these factors, the Commission concluded that the purchase price was "prudent."

The Commission next reviewed the evidence bearing upon benefits and costs of the transfer should an acquisition adjustment be allowed. Regarding whether North Topsail was a "troubled" utility, the Commission commented that this question, while "relevant to a proper resolution of the acquisition adjustment issue," should not "be deemed dispositive." Indeed, as pointed out by the Commission, placing undue weight upon the "troubled" condition of the system would be inconsistent with the requirements of G.S. § 62-111(a) and *Comm. v. Village of Pinehurst*, 99 N.C. App. at 229, 393 S.E.2d at 115, that the Commission consider all relevant factors.

The Commission concluded North Topsail at the time of the hearing was "financially troubled," but that North Topsail's "past travails," notwithstanding "[t]he fervor of the parties' advocacy," were "relevant" to the acquisition adjustment issue "to the extent that earlier developments impact[ed] North Topsail's current situation." The Commission went on to observe that North Topsail customers were not plagued with serious operational problems at the time of the transfer and that transfer would not immediately affect the quality of service provided to them.

**IN RE PETITION OF UTILS., INC.**

[147 N.C. App. 182 (2001)]

In addition, the Commission noted UI's willingness to purchase the system "was not conditioned on inclusion of the proposed acquisition adjustment in the rate base," and that North Topsail's customers would

> get the benefit of ownership and operation by an adequately-capitalized and professionally-run utility regardless of [the Commission's] decision

regarding the acquisition adjustment. Further, the Commission pointed out that

> [t]he fact that UI's obligation to purchase North Topsail is not conditioned upon approval of the proposed acquisition adjustment distinguishes this case from the numerous recent Commission decision upon which UI places emphasis.

The Commission also considered the impact of the acquisition adjustment on rates. It found that inclusion of the acquisition adjustment would increase North Topsail's per-customer investment from $503.00 to $1,390.00 and would

> place upward pressure on the uniform rates charged by UI's largest North Carolina subsidiary in the event the two systems were to be consolidated.

Before the Commission, UI relied heavily upon *In re Heater Utilities, Inc. (Hardscrabble)*, NCUC Docket No. W-274, Sub 122, 9 (1997), a case in which purchase of the utility was not conditioned upon inclusion of the purchase price in rate base. The Commission distinguished *Hardscrabble*, calculating the impact on rates of the proposed acquisition in the case *sub judice* to be eight times that allowed in *Hardscrabble*.

Finally, the Commission observed that UI's willingness to purchase North Topsail was not conditioned upon inclusion of the acquisition adjustment in rate base and that at least one other adequately-capitalized utility had attempted to buy North Topsail without seeking rate base treatment for an acquisition adjustment. Accordingly, the Commission concluded, customers of North Topsail would obtain the benefit of ownership and operation by an adequately capitalized and professionally run utility whether or not inclusion of the acquisition adjustment in rate base was approved.

In short, UI's assertions to the contrary, the Commission did not create a "new standard," but rather properly considered all factors

and rendered a decision consistent with prior acquisition adjustment cases. We therefore reject UI's second argument.

III.

**[3]** Lastly, UI assigns error to the Commission's "reduc[tion of] rates outside of a general rate case." UI cites the Commission's reduction in the instant transfer proceeding under G.S. § 62-111 of connection or "tap" fees and contends the Commission erred in doing so without complying with the general rate case procedures established in N.C.G.S. § 62-133 (1999). UI's final argument is unfounded.

First, we note Public Staff's (Staff) response in its appellate brief. Staff, in statements sustained by reference to the instant record, observed that UI

> stated in its proposed order [to the Commission], 'At the hearing and in its proposed order, UI agreed with the Public Staff recommendation that connection fees charged after the transfer should be reduced' . . . . [UI] offered no evidence during the hearing contesting a lowering of the connection fee. There is also nothing in the record to substantiate the claim in [UI]'s brief that ' . . . the substantial reduction ordered in this case affects revenues to a substantial degree and significantly lowers rate of return.'

It appears, therefore, that UI may have failed to preserve this final contention for our review, *see* N.C.R. App. P. 10(b) (1999) ("to preserve a question for appellate review, a party must have presented to the trial [tribunal] a timely request, objection or motion, stating the specific grounds for the ruling the party desired"), and that it is in any event estopped from asserting on appeal a position contrary to that advanced before the Commission, *see Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934) ("the law does not permit parties to swap horses between courts in order to get a better mount [on appeal]").

Further, N.C.G.S. § 62-137 (1999) provides in pertinent part as follows:

> the Commission shall declare the scope of the hearing by determining whether it is to be a general rate case, under G.S. 62-133, or whether it is to be a case confined to the reasonableness of a specific single rate, a small part of the rate structure, or some classification of users involving questions which do not require a determination of the entire rate structure and overall rate of return.

G.S. § 62-137. In its 3 August 1999 order setting a public hearing on the proposed transfer of North Topsail to UI, the Commission designated "appropriate tap-fees" as among the issues to be addressed.

Finally,

[c]ourts should be hesitant to disturb the Commission's expert determination with regard to the nature of the case presented, particularly when its determination is made prior to hearing and for the initial purpose of setting the scope of the hearing and the resulting amount of information which the public utility will be required to furnish.

*State ex rel. Utilities Comm'n. v. Rail Common Carriers*, 42 N.C. App. 314, 318, 256 S.E.2d 508, 511 (1979).

In short, the Commission having determined that the issue of connection fees was appropriate in the instant proceeding and that a general rate case was not required, and UI having interposed no objection thereto, we decline to disturb the Commission's determination. *See id.*

Affirmed.

Chief Judge EAGLES and Judge McCULLOUGH concur.