STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; PUBLIC STAFF — UTILITIES COMMISSION, INTERVENOR-APPELLEES
v.
CAROLINA WATER SERVICE, INC. OF NORTH CAROLINA, APPLICANT-APPELLANT
AND
CHARLOTTE-MECKLENBURG UTILITIES, A DEPARTMENT OF THE CITY OF CHARLOTTE, INTERVENOR-APPELLANT

No. COA12-475

Filed 15 January 2013

**1. Utilities—sale of water system—allocation of gain—findings**

Where the City of Charlotte annexed property and Charlotte-Mecklenburg Utilities ("CMU") took over an existing water system (Carolina Water Service, Inc. of North Carolina (CWSNC)), the Utilities Commission's findings were supported by competent, material, and substantial evidence and justified the Commission's conclusion to allocate an estimated $3.36 million of the gain on sale to CWSNC's remaining ratepayers. A decision of the Commission is presumed to be just and reasonable and the evidence relied on by the Commission in this case was comprehensive, thorough, well thought out, based on the testimony of witnesses for the Public Staff as well as the Utility, and supported by precise data concerning the nature of the transfer.

STATE OF N.C. EX REL. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

2. **Utilities—sale of water system—allocation of gain— Commission policy—not arbitrary and capricious**

Although appellants argued that a Utilities Commission's order should be overturned as arbitrary and capricious because the Commission's policy concerning allocation of the gain from the sale of water systems and its exception were poorly defined, the validity of the policy was addressed in prior cases and found not to be arbitrary and capricious.

3. **Utilities—sale of water system—allocation of gain— Commission's policy—not arbitrary as applied**

The Utilities Commission's application of its policy concerning gain from the sale of water systems, even when compared with the Commission's contrary decision in a different case on the same day, was carefully considered, the result of reasoned judgment, and not arbitrary and capricious as applied.

4. **Utilities—sale of water system—allocation of gain— Commission's authority**

The Utilities Commission did not exceed its statutory authority by allocating a portion of the gain on sale of a water utility to ratepayers and thus committed no error of law in an action arising from the City of Charlotte's annexation of property and the purchase of an existing water system. Contrary to the argument of the purchased utility, the Commission's authority exists under chapter 62 of the North Carolina General Statutes, not "general ratemaking principles." The allocation of a portion of the gain on sale falls within the auspices of the policy established by that statute.

5. **Utilities—sale of water system—allocation of gain—due process and equal protection rights of utility—not violated**

The Utilities Commission's order allocating the gain from the sale of a water system was based on reasoned decision making, and was neither arbitrary and capricious nor lacking a legitimate government purpose. Neither the utility's due process nor equal protection rights were violated.

6. **Utilities—sale of water system—allocation of gain—not confiscation of property**

The Utilities Commission's allocation of a portion of the gain on the sale of a water system did not constitute a confiscation of property without just compensation in violation of Article I, section 19, of the North Carolina Constitution. Although the utility

STATE OF N.C. EX REL. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

argued that it held vested rights because of its reliance during contracting on the Commission's longstanding policy, the Commission is empowered by the legislature to regulate utilities and, with that, allocate a portion of the gain on sale to either the utility or its ratepayers. The merits of the Commission's policy were not commented upon beyond a police power review that found no constitutional violation.

Appeal by appellants from order entered 23 December 2011 by the North Carolina Utilities Commission. Heard in the Court of Appeals on 26 September 2012.

> *Poyner Spruill LLP, by Robert F. Orr, Christopher J. Ayers, and Andrew H. Erteschik, for Applicant-Appellant Carolina Water Service, Inc. of North Carolina.*

> *Styers & Kemerait, PLLC, by Karen M. Kemerait and M. Gray Styers, Jr., for Intervenor-Appellant Charlotte-Mecklenburg Utilities, A Department of the City of Charlotte.*

> *Public Staff, Robert P. Gruber, Executive Director, by David T. Drooz, for Intervenor-Appellee the North Carolina Utilities Commission.*

STEPHENS, Judge.

*Factual Background and Procedural History*

This case arises out of an agreement between the Applicant-Appellant, Carolina Water Service, Inc. of North Carolina ("CWSNC" or "the Utility") and the Intervenor-Appellant, Charlotte-Mecklenburg Utilities ("CMU"), which is a branch of the City of Charlotte ("the City"). CWSNC is a publicly franchised utility that provides water and sewer services to customers in the State of North Carolina. Among its customers are the residents of an area referred to as the "Cabarrus Woods Systems," which exists just east of the Mecklenburg County line in Cabarrus County, North Carolina.

On 30 June 2009, the City annexed the Cabarrus Woods Systems, making it a part of the City of Charlotte. By doing so, the City took on a legal obligation to provide the area with water and sewer services under chapter 160A of the North Carolina General Statutes and the City's own policies. In order to avoid duplicating the current infrastructure and still meet its obligation to provide water and sewer services, CMU entered into a "tentative agreement" with CWSNC in early

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

2009 to purchase the Utility's existing water and sewer facilities and adapt them for use by the City. Under that agreement, CMU would pay CWSNC $25.7 million for the right to use CWSNC's existing water and sewer infrastructure. Because the current infrastructure was valued at approximately $6.5 million (as of 30 August 2011), CWSNC would realize a "gain on sale"[1] of approximately $19.2 million with the completion of its $25.7 million transaction with the City. The contract between CMU and CWSNC also includes an "escape clause," which allows CWSNC to terminate the agreement if the North Carolina Utilities Commission ("the Commission") does not approve assignment of 100% of the gain on sale to CWSNC's shareholders.

With regard to the allocation of customers, the agreement between CWSNC and the City would result in the transfer of between 10% and 25% of those individuals serviced by CWSNC to the City. Specifically, 2,849 of CWSNC's 21,650 water customers (13.2%) and 3,359 of CWSNC's 13,585 sewer customers (24.7%) would be transferred from CWSNC to the City. Because of the nature of economies of scale (i.e., those cost advantages that come with having a larger customer base),[2] customers who would be transferred from CWSNC to CMU could expect an average reduction of $34.53 in their monthly water and sewer bill (from $80.70 to $46.17 per month—a 42.8% decline), and customers staying with CWSNC could expect an average increase of $4.78 in their monthly water and sewer bill (from $80.70 to $85.48 per month—a 5.9% rise). As a result, the newly inducted members of CMU's water and utilities service could expect an average yearly bill of $554.04 if they paid for both services, and CWSNC's remaining customers could expect an average yearly bill of $1,025.76 if they did the same.

On 3 March 2011, CWSNC filed an application with the Commission to transfer the current water and sewer infrastructure located in the Cabarrus Woods Systems to the City. Two and a half

---

1. In its brief, CWSNC defined "gain on sale" as "the difference in the purchase price of a utility system as compared to the utility system's actual value."

2. Though a lengthy discussion of the nature of economies of scale is unnecessary, Mr. Steven M. Lubertozzi ("Lubertozzi"), Executive Director of Regulatory Accounting and Affairs at Utilities, Inc., of which CWSNC is a subsidiary, provided a helpful explanation of the concept during his testimony. There he pointed out that a utilities system with a larger customer base is more easily "able to 'share' employees and costs associated with customer service, billing, and operations. Such costs are spread across a larger customer base, thus reducing the amount each customer pays toward such expenses. Customers also receive the savings associated with the utility's increased purchasing power . . . ."

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

months later, on 17 May 2011, CMU moved to intervene and participate as a full party in CWSNC's application. The Commission granted CMU's motion to intervene and set the matter for an evidentiary hearing on 23 August 2011.

Four months after the hearing, on 23 December 2011, the Commission published its order and determined as a matter of fact that "[t]he transfer of the Cabarrus Woods Systems will have a significant adverse impact on the rates of the remaining [CWSNC] customers . . . ." In support of that finding, the Commission cited "an increase in the average water bill of $2.37 per month and [an increase] in the average sewer bill of $2.41 per month" for the remaining CWSNC customers. After considering a number of factors, the Commission determined that "overwhelming and compelling evidence [existed] to justify an exception to the Commission's . . . policy [("the Policy")] of assigning 100% of the gain on sale of water and/or sewer utility systems to utility company shareholders . . . ." In so holding, the Commission emphasized that it was employing a recognized and longstanding exception to the Policy. In conclusion, the Commission determined that "an estimated $3.36 million or 17.5%" of the $19.2 million gain on sale should be allocated to CWSNC's remaining ratepayers. The remaining $15.83 million would be assigned to CWSNC's shareholders. Commissioner Tonola D. Brown-Bland filed a separate opinion, concurring in part and dissenting in part, arguing that "losses caused by losing the advantages of scale, no matter the magnitude, [do] not present overwhelming and compelling evidence to stray from the position of awarding 100% of gain to shareholders."

CWSNC and CMU appeal the Commission's 23 December 2011 order assigning $3.36 million of the $19.2 million gain on sale to the CWSNC ratepayers.

## Standard of Review

The extent of appellate review of decisions from the North Carolina Utilities Commission is described in the North Carolina General Statutes, chapter 62, section 94. *State ex rel. Utils. Comm'n v. Gen. Tel. Co. of Se.*, 281 N.C. 318, 336, 189 S.E.2d 705, 717 (1972). There the General Assembly has stipulated that "any . . . order made by the Commission under the provisions of [chapter 62, section 94] shall be prima facie just and reasonable." N.C. Gen. Stat. § 62-94(e) (2011).

A reviewing court may affirm or reverse an order of the Commission, declare it null and void, or remand the case for further proceedings if—after a review of the whole record—the Commission's

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

findings, inferences, conclusions, or decisions prejudiced the substantial rights of the appellants (here, the rights of CWSNC and CMU) and were:

(1) In violation of constitutional provisions, or

(2) In excess of statutory authority or jurisdiction of the Commission, or

(3) Made upon unlawful proceedings, or

(4) Affected by other errors of law, or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

(6) Arbitrary and capricious.

*Id.* at § 62-94(b)–(c). The Commission's findings may not be "reversed or modified by a reviewing court merely because the court would have reached a different finding or determination upon the evidence." *Gen. Tel. Co. of Se.*, 281 N.C. at 337, 189 S.E.2d at 717; *see also State ex rel. Utils. Comm'n, Carolina Power & Light Co. v. Carolina Indus. Group for Util. Rates*, 130 N.C. App. 636, 639, 503 S.E.2d 697, 699–700 (1998) ("[W]here there are two reasonably conflicting views of the evidence, the appellate court may not substitute its judgment for that of the Commission.").

## Discussion

CWSNC and CMU argue on appeal that the Commission's decision was: (1) erroneous as not supported by competent, material, and substantial evidence; (2) arbitrary and capricious; (3) an error of law; and (4) a violation of constitutional provisions. We will address these arguments in the order they are presented.

### I. Competent, Material, and Substantial Evidence

[1] If the Commission's findings of fact are supported by competent, material, and substantial evidence, then they are considered to be conclusive on appeal. *Gen. Tel. Co. of Se.*, 281 N.C. at 336–37, 189 S.E.2d at 717 (collecting cases). "Substantial evidence" is defined as "more than a scintilla or a permissible inference" and consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State ex rel. Utils. Comm'n v. S. Coach Co.*, 19 N.C. App. 597, 601, 199 S.E.2d 731, 733 (1973). A court

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

typically presumes that the Commission has given proper considera-tion to all competent evidence presented "[i]n the absence of an express statement by the Commission to the contrary, some record evidence to the contrary, or a summary disposition which indicates to the contrary . . . ." *State ex. Rel. Utils. Comm'n v. Thornburg*, 316 N.C. 238, 244-45, 324 S.E.2d 28, 33 (1986). Further, in determining the validity of evidence presented before the Commission, the North Carolina Supreme Court has held that "it is for the administrative body, in an adjudicatory proceeding, to determine the weight and suf-ficiency of the evidence and the credibility of witnesses, to draw inferences from the facts, and to appraise conflicting and circum-stantial evidence." *State ex. Rel. Utils. Comm'n v. Thornburg*, 314 N.C. 509, 515, 334 S.E.2d 772, 775 (1985) (internal quotation marks and citation omitted) [hereinafter *Thornburg I*].

In support of its conclusion that "it is reasonable and appropriate to assign an estimated $3.36 million or 17.5% of the gain on sale to the remaining ratepayers [at CWSNC]," the Commission made three per-tinent findings of fact. First, the Commission found that, absent regu-latory action, the transfer of the Cabarrus Woods Systems would have a "significant adverse impact" on the rates of the remaining CWSNC ratepayers, estimated to be an increase of $2.37 (5.8%) per month in the average water bill and $2.41 (6.0%) per month in the average sewer bill. Second, the Commission found that these significant adverse effects would be caused by the transfer of a large number of customers (6,208 ratepayers) from CWSNC, which constituted over-whelming and compelling evidence to justify an exception to the Policy. Third, the Commission found that "[t]he apportionment of 17.5% of the gain on sale to the remaining [CWSNC] ratepayers is nec-essary in order to offset the extraordinary and exceptional negative impact to such customers."

In support of its findings, the Commission cited to the testimony of Public Staff witness Katherine A. Fernald ("Fernald"), Supervisor of the Water Section of the Public Staff—Accounting Division, who deter-mined that the transfer of the Cabarrus Woods Systems from CWSNC to CMU would have a negative impact on the remaining CWSNC ratepay-ers without some sort of sharing in the gain on sale.

> [Fernald] opined that in the past the large regulated water and sewer companies who were selling systems, such as [CWSNC], were growing in customer base at such a rate that the addition of new customers in other areas would quickly offset the loss of the customers being transferred. . . . [I]n

STATE OF N.C. EX REL. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

recent years the rate of customer growth for water and sewer companies has declined, and for [CWSNC], the number of customers has actually decreased [during certain years].

On that reasoning the Commission concluded "it is likely that the increase in the cost of service for the remaining ratepayers . . . will not be offset by customer growth anytime soon," noting Fernald's clarification that "the detrimental impact on the remaining ratepayers will be especially acute" given the loss of 13.2% of the uniform water rate customer base and 24.7% of the uniform sewer rate customer base in this case.

The Commission also relied on the testimony of Fernald that CWSNC's slow growth rate would likely mean that this adverse rate impact would persist for many years. At that time, CWSNC had experienced a net increase of only fifteen customers since June of 2006. Given the average rate increases for CWSNC's remaining ratepayers of 5.8% ($2.37) per month for water operations and 6.0% ($2.41) per month for sewer operations, Fernald estimated that $3.36 million would be required "to protect [the remaining ratepayers] from the adverse effects of the sale for a five-year period." Though Lubertozzi, witness for the Utility, testified that CWSNC "continued to seek to grow its customer base," the Commission cited as evidence undercutting that aspiration his own acknowledgement that "the housing market has suffered significant downturns over the past five years, so organic customer growth has not been as robust as CWSNC would have hoped." The Commission also pointed to Lubertozzi's concession on cross-examination that "the proposed transfer would cause diseconomies of scale [for CWSNC]," which would not be offset by cost reductions.

Based on that evidence, the Commission took pains to lay out specific distinguishing factors between this case and its previous decisions, all of which had assigned 100% of the gain on sale to shareholders since the Policy was first implemented on 7 September 1994. First, this was the only case in which the adverse impact on rates had been quantified.[3] Second, the evidence showed that the adverse

---

3. The Commission noted, however, that it was in the process of deciding another case, Order Determining Regulatory Treatment of Gain on Sale in the Matter of the Application by Aqua North Carolina, Inc., Docket No. W-218, Subs 325, 327, and 319 (23 December 2011) [hereinafter *Aqua*], in which rates were also being quantified. In *Aqua*, the Commission eventually found that there was *not* overwhelming and compelling evidence to justify excepting the Policy—despite the fact that the adverse impact on rates was similarly quantified. That disparity is a part of the Appellants' contention in Part II, *infra*.

128          IN THE COURT OF APPEALS

STATE OF N.C. EX REL. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

impact on remaining customers was, for the first time in seventeen years, likely to persist—due in part to CWSNC's lack of growth. Third, the transfer resulted in "extraordinarily large numbers of customers . . . subject to being transferred."[4] Fourth, CWSNC sought to transfer fifteen additional utility systems above and beyond CMU's required annexation area. According to the Commission, CMU initially approached CWSNC about purchasing only nine subdivisions in what eventually came to be a twenty-four-subdivision agreement for transfer. "The remaining [fifteen] subdivisions were included in the purchase to accommodate [CWSNC]'s business plan." Therefore, unlike past Commission-approved transfers, the Commission reasoned that "[CWSNC] faced no threat of being paralleled and losing [the Cabarrus Woods Systems] customers as a result."[5] These four circumstances, taken together, were enough for the Commission to determine that there was overwhelming and compelling evidence sufficient to justify assigning a portion of the gain on sale to the ratepayers remaining with CWSNC.

As a consequence, the Commission determined that CWSNC was "not likely to offset the loss of the Cabarrus Woods Systems customers through growth anytime in the near future." The Commission recognized "the policy trade-off this transfer creates" (*i.e.*, the fact that those individuals transferred to CMU would benefit from lower rates while those who stayed with CWSNC would experience even higher rates unless CWSNC were to grow enough to offset the loss of customers), but cited to CWSNC's lack of significant growth since 2006 and the "slow growth in the economy in general" for support.

---

4. The deal would result in the transfer of 6,208 individuals (*i.e.*, 17.6% of CWSNC's customer base).

5. Chief engineer for CMU, Barry Shearin, has described the paralleling process as follows:

> [If the agreement falls through, t]he City must . . . provide water and wastewater service to the areas that were annexed effective June 30, 2009. . . . CMU would need to install basic water and sewer systems in the annexed areas if it does not acquire [CWSNC's] systems.
> . . . .
> [I]t is more efficient and cost-effective for the City to acquire [CWSNC]'s facilities than to incur the unnecessary expense of duplicating facilities. . . . [I]t is not in the public interest for a city to have to expend limited public funds to construct duplicate facilities, when adequate facilities are already in place.
> . . . .
> The City would also be harmed because it has constructed major outfalls and reserved additional treatment capacity . . . [, and] the City would potentially end up with significant "stranded investment" if it is not able to purchase [CWSNC]'s systems . . . .

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

Accordingly, the Commission found that "the proposed transfer would increase the cost of service for the ratepayers who would remain with [CWSNC] after the transfer," resulting in "an explicit significant adverse impact," and concluded that it was reasonable and appropriate to assign an estimated $3.36 million to CWSNC's remaining ratepayers.

CWSNC and CMU ("the Appellants") argue that the Commission's findings and conclusion are not based on competent evidence because the Commission has previously assigned 100% of the gain on sale to shareholders on a consistent basis for the past seventeen years. They contend that losses of economies of scale are the "inevitable consequence" of the preferable process of transferring systems to a municipality and cite to a previous decision by the Commission, which found that such losses "do not justify awarding a portion of the gain on sale to remaining ratepayers." The Appellants also contest the Commission's finding that CWSNC is unlikely to grow its customer base as "speculative, opinion testimony, which is incompetent evidence." We are not persuaded.

While the Appellants provide valid reasons for why the Commission might not have chosen to allocate a portion of the gain on sale to ratepayers, they are not sufficient to show that the Commission's decision was not based on competent, material, and substantial evidence. We presume a decision of the Commission to be just and reasonable. *See* N.C. Gen. Stat. § 62-94(e). Accordingly, our Supreme Court has held that the final decision of the Commission should be upheld as based on competent evidence even when it is based on evidence that is "somewhat skimpy" or "more like conclusions." *See Thornburg I*, 314 N.C. at 515, 334 S.E.2d at 775 (holding that the Commission's findings of fact were supported by the evidence and binding on appeal despite being "somewhat skimpy" and "more like conclusions"). Even if we disagree with the Commission's rationale, we are not empowered to overturn its order when that order is based on competent evidence. *See Gen. Tel. Co. of Se.*, 281 N.C. at 336-37, 189 S.E.2d at 717.

Unlike *Thornburg I*, the evidence relied on by the Commission in this case is comprehensive, thorough, and well thought out. It is based on the testimony of witnesses for the Public Staff as well as the Utility and supported by precise data concerning the nature of the transfer. Thus, given the Commission's allotted authority to determine the weight and sufficiency of the evidence, and after a thorough review of said evidence and its relation to the Commission's findings,

STATE OF N.C. EX REL. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

we hold that those findings are supported by competent, material, and substantial evidence, and that they justify the Commission's conclusion to allocate an estimated $3.36 million of the gain on sale to CWSNC's remaining ratepayers.

## II. *Arbitrary and Capricious*

[2] "Decisions are arbitrary and capricious when, among other things, they indicate a lack of fair and careful consideration or fail to display a reasoned judgment." *Thornburg I*, 314 N.C. at 515, 334 S.E.2d at 776. If this Court merely disagrees with the Commission on factual or policy grounds, it may not substitute its judgment for that of the Commission. *See In re Utils., Inc.*, 147 N.C. App. 182, 187, 555 S.E.2d 333, 337 (2001) ("[T]he appellate court . . . may not substitute its judgment, either with respect to factual disputes *or policy disagreements*, for that of the Commission.") (emphasis added) (internal quotation marks and citation omitted).

## A. *Validity of the Policy*

The Appellants argue that the Commission's order should be overturned as arbitrary and capricious because the Policy and its exception are poorly defined. In support of that point, CMU characterizes the Policy as "fraught with uncertainty as it provides no objective standard for what evidence is required to make an exception to the Commission's gain on sale policy." CWSNC asserts that the Commission's decision was arbitrary and capricious because it "never articulated a standard that can be uniformly and fairly applied to transactions involving a gain on sale" and none of the Commission's orders define the term "overwhelming and compelling evidence." We are not persuaded.

This Court has already addressed the validity of the Policy. In *Public Staff I*, this Court addressed the Commission's first application of the Policy and determined that it was not arbitrary and capricious, but refrained from addressing the Policy's validity outside of that factual circumstance. *State ex rel. Utils. Comm'n v. Public Staff—N.C. Utils. Comm'n*, 123 N.C. App. 43, 51, 472 S.E.2d 193, 199 (1996) (stating that the Policy's future applicability was not properly before this Court) [hereinafter *Public Staff I*]. We affirmed that decision in *Public Staff II* and established that the Policy was valid in and of itself. *State ex. rel. Utils.. Comm'n v. Public Staff—N.C. Utils. Comm'n*, 123 N.C. App. 623, 628, 473 S.E.2d 661, 665 (1996) [hereinafter *Public Staff II*]. In so holding, we reasoned that "enactment of

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

the policy by the Commission within an adjudicative proceeding" was not "capricious, unreasonable, or arbitrary action or disregard of law" and, thus, was not an abuse of discretion. *Id.* at 627, 473 S.E.2d at 664.

In both cases, we thoroughly vetted the extent to which the Commission's policy could be considered arbitrary and capricious and found that it was not, despite the Commission's failure to more fully define the terms used therein. Accordingly, we apply those decisions and affirm the Commission's use of the Policy here. *See In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

### B. Application of the Policy

[3] Alternatively, the Appellants argue that the Policy is arbitrary and capricious as applied, contending that the order in this case is not consistent with the Commission's prior determinations on similar facts.[6] Most notably, the Appellants cite to the Commission's opinion in *Aqua*, decided on the same day as this case. There the Commission assigned 100% of the gain on sale to the shareholders of the public water and sewer utility Aqua North Carolina, Inc. ("the Aqua utility") under similar factual circumstances. Importantly, *Aqua* was at that time the only case other than this one in which the Commission had been able to quantify the adverse impact against ratepayers. In so doing, the Commission determined that the *Aqua* ratepayers would be subject to a $1.96 increase in their monthly sewer bill as a result of the transfer. Appellants argue that the Commission's disparate orders in this case and *Aqua* constitute an arbitrary and capricious application of the Policy. We disagree.

For the Commission's order to be arbitrary and capricious, it must lack fair and careful consideration or fail to display a reasoned judgment. *Thornburg I*, 314 N.C. at 515, 334 S.E.2d at 776. Though the Commission's opinions in *Aqua* and in this case share similarities, the two cases are based on different facts. The average rate increase for customers of the Aqua utility was 3% (or $1.96) per month for sewer services. Water bills were not impacted. In this case, the average rate increase for CWSNC customers would be 5.8% (or $2.37) per month

---

6. We note that the past decisions of a previous panel of the North Carolina Utilities Commission are not binding on later panels of the Commission or this Court. *See State ex rel. Utils. Comm'n v. Thornburg*, 325 N.C. 463, 467, 385 S.E.2d 451, 453-54 (1989); *State ex rel. Utils. Comm'n v. Carolinas Comm. for Indus. Power Rates & Area Dev., Inc.*, 257 N.C. 560, 569-70, 126 S.E.2d 325, 333 (1962).

STATE OF N.C. ᴇx ʀᴇʟ. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

for water services and 6% (or $2.41) per month for sewer services. While the difference between these numbers may seem slight, they are consistently higher in this circumstance and apply to both water and sewer services, unlike in *Aqua*.

In addition, a larger number of people would be transferred in this case than *Aqua*. Here, approximately 6,208 customers would be transferred from CWSNC to CMU. This accounts for approximately 17.6% of the CWSNC sewer customers and approximately 13.2% of its water customers. In *Aqua*, only 910 customers were transferred. That accounted for approximately 7.06% of the Aqua utility's sewer customers. We also note that the Aqua utility has a policy disfavoring the loss of customers and, unlike CWSNC, the Commission characterized "[the Aqua utility's] business model [as] one of purchase, improvement, and long-term ownership and operation," clearly establishing it as "a growth company."

CWSNC has not established itself as a growth company. The Utility lost ratepayers from 2008 to 2009 and from 2009 to 2010, and its customer base has only experienced a "net increase" of fifteen ratepayers since its original peak in June of 2006. Further, CWSNC recently lost additional customers with the sale of the Corolla Light/Monteray Shores water system. While CWSNC argues that the Commission should not base its decision on mere speculation regarding CWSNC's ability to add customers in the future, the raw data show a persistent plateau effect, if not a downturn, in CWSNC's customers.[7]

The Commission's decision to rely on the data presented here is reasoned. Accordingly, we hold that the Commission's application of its Policy, even when compared with the Commission's decision in *Aqua*, was carefully considered, the result of reasoned judgment, and not arbitrary and capricious. Therefore, we affirm the order of the Commission and hold that it was not arbitrary and capricious as applied.

### III. *Error of Law*

**[4]** An error of law sufficient to overturn a decision of the Commission exists when the Commission exceeds its statutory authority in such a way that the substantial rights of the appellants are prejudiced. N.C. Gen. Stat. § 62-94(b); *see also State ex rel. Utils. Comm'n v. Public Staff—N.C. Utils. Comm'n*, 309 N.C. 195, 213, 306

---

7. Under the theory of economies of scale, the more customers a utility is able to add, the more likely it is to be able to offset the negative effects of transferring away large groups of ratepayers.

STATE OF N.C. EX REL. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

S.E.2d 435, 445 (1983) ("The Commission, in both of these cases, exceeded its statutory authority to the prejudice of the substantial rights of the ratepayers and thus the orders in both cases were affected by error of law.").

CWSNC argues that the Commission committed an "error of law" by assigning a portion of the gain on sale to its ratepayers. In constructing that argument, the Utility characterizes the Commission's assignment of $3.36 million as a "subsidy" to remaining ratepayers and alleges that this subsidy constitutes reversible "error of law." CWSNC justifies this quasi-syllogism by asserting that its customers from the Cabarrus Woods Systems, who would be transferred to the City if the deal proves successful, are "low-cost" customers and, thus, essentially provide a subsidy to CWSNC's other, "high-cost" customers elsewhere. Therefore, CWSNC claims, the removal of the Cabarrus Woods Systems customers would mean that the remaining customers would simply have to pay the "actual cost" of their utilities. As such, any money allocated to the remaining customers from the gain on sale would constitute an improper "subsidy" in "blatant violation of cost of service legal principles, resulting in ratepayers paying rates that are lower than the actual cost of providing service." We disagree.

CWSNC supports its argument by citing to an eighty-five-year-old opinion of the United States Supreme Court, which states that customers do not have an ownership interest in a company that provides a service to them and "[p]roperty paid for out of moneys received for service belongs to the company . . . ." The Utility characterizes this pronouncement as one component of certain overarching and ethereal "general ratemaking principles," which are neither codified nor violable. Such a principle is not applicable here.

The Commission's authority exists under chapter 62 of the North Carolina General Statutes, not "general ratemaking principles." *See State ex rel. Comm'r of Ins. v. N.C. Rate Bureau,* 300 N.C. 381, 399, 269 S.E.2d 547, 561 (1980) ("The powers and authority of administrative officers and agencies are derived from, defined and limited by constitution, statute, or other legislative enactment."). Chapter 62 empowers the Commission "to regulate public utilities generally, their rates, services and operations, and their expansion . . . ." N.C. Gen. Stat. § 62-2(b). The Commission is considered "an administrative board or agency of the General Assembly" and is empowered to promulgate rules and regulations and fix utility rates. N.C. Gen. Stat. § 62-23. By enacting chapter 62, our General Assembly conferred

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

"broad powers to regulate public utilities and to compel their operation in accordance with the policy of the State . . . ." *Public Staff II*, 123 N.C. App. at 625, 473 S.E.2d at 663 (citation omitted).

Chapter 62, section 2 declares the policy of the State of North Carolina to be the fair regulation of public utilities in the interest of the public, just and reasonable rates and charges for public utility services without unjust discrimination, and, *inter alia*, the assurance that rates are set in a manner fair to utilities and customers. N.C. Gen. Stat. § 62-2(a). The allocation of a portion of the gain on sale falls within the auspices of that policy. Accordingly, we hold that the Commission did not exceed its statutory authority by allocating a portion of the gain on sale to ratepayers and, thus, committed no error of law.

### IV. Constitutional Challenges

CWSNC argues that the Commission's order violates Article I, section 19, of the North Carolina Constitution because (A) it arbitrarily and capriciously distinguished between CWSNC and the Aqua utility, without justification, and (B) it was confiscatory and constituted a taking without just compensation. Article I, section 19 of the North Carolina Constitution provides, in pertinent part: "No person shall be . . . deprived of his life, liberty, or property, but by the law of the land. No person shall be denied equal protection under the laws . . . ." N.C. Const. art. I, § 19.

### A. Substantive Due Process and Equal Protection

[5] Public utilities are protected against disparate treatment under Article I, section 19, unless the government action at issue is rationally related to a legitimate government interest. *See Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980). CWSNC first argues that the Commission's assignment of $3.36 million of the gain on sale violated these provisions because it was (1) arbitrary and capricious in the context of the *Aqua* decision and (2) constituted disparate treatment without a rational basis. We disagree.

As we noted in section II(B), *supra*, the Commission's order was based on reasoned decision making. Though the *Aqua* case is factually similar to this one, we determined that there were sufficient distinguishing factors to warrant the Commission's allocation of a portion of the gain on sale. We find that reasoning persuasive in this context as well and hold that the Commission's allocation of a portion of the gain on sale was not arbitrary and capricious under Article I, section 19.

STATE OF N.C. ex rel. UTILS. COMM'N v. CAROLINA WATER SERV. INC. OF N.C.

[225 N.C. App. 120 (2013)]

In addition, we are not persuaded by CWSNC's contention that its equal protection rights were violated. CWSNC contends that the Commission's order stemmed solely from the Commission's belief that, given the large size of the gain on sale in this case, the Utility "can afford it." We disagree. The purpose of assigning gain on sale to shareholders is to provide an incentive for utilities to sell water and sewer services to municipalities, which are typically better stewards of such services. In this case, as the Public Staff rightly noted, the Commission had determined that $15.83 million was a sufficient incentive for CWSNC to make such a transfer, "especially given the risk that CMU could parallel their systems and deprive CWSNC of any gain on sale . . . ." We find this reasoning to be sensible and hold that the Commission's order is rooted in a rational, legitimate, government purpose. Accordingly, we affirm the Commission's order as neither arbitrary and capricious nor lacking a legitimate government purpose.

### B. Taking Without Just Compensation

[6] Second, CWSNC asserts that the allocation of a portion of the gain on sale constituted a confiscation of property without just compensation in violation of Article I, section 19, of the North Carolina Constitution. CWSNC again characterizes the $3.36 million portion of the gain on sale that was assigned to ratepayers by the Commission as a "subsidy" and argues that CWSNC held vested rights in the entire gain on sale because of its reliance during contracting on the Commission's longstanding policy against assigning anything less than 100% of the gain on sale to a utility's shareholders. That argument is not applicable here.

Our Supreme Court addressed a similar challenge in *State ex rel. Utils. Comm'n v. N.C. Nat. Gas Corp.*, 323 N.C. 630, 375 S.E.2d 147 (1989). In that case, a natural gas corporation argued that the Commission's order requiring that monies collected by the gas utility be allocated to certain customers amounted to an unlawful taking of property without due process. *Id.* at 631, 375 S.E.2d at 147. There our Supreme Court pointed out that "under the police power the state [sic] has authority to enact legislation to regulate the charges and business of a public utility." *Id.* at 643, 375 S.E.2d at 154 (internal quotation marks, brackets, and citation omitted). Recognizing that "[a]ny exercise by the State of its police power is, of course a deprivation of liberty," the Court looked to the degree of the reasonableness of the execution of that power when determining its constitutionality. *Id.* at 644, 375 S.E.2d at 155. Because an order of the Commission is legislative in nature, the Court subjected it to the same constitutional

tests as other legislative enactments employing the police power. *Id.* Accordingly, the Supreme Court held that the Commission's actions were not an unconstitutional taking because the "benefit to the public outweighs any deprivation of [the utility's] constitutional rights." *Id.* at 645, 375 S.E.2d at 155. We apply that line of reasoning here.

As has been discussed, *supra*, the Commission is empowered by the legislature to regulate utilities and, with that, allocate a portion of the gain on sale to either the utility or its ratepayers. The Commission's decision to employ that power here, while contrary to the general rule established in its Policy, is not an unconstitutional taking. As discussed above, the Commission allocated $3.36 million out of a $19.2 million gain on sale to the ratepayers because of (1) the significant adverse impact on ratepayers, (2) the likely persistence of that adverse impact, (3) the large number of customers being lost, and (4) its determination that $15.83 million was a sufficient incentive to live up to its policy goal of incentivizing the transfer of customers from utilities to municipalities.

At the outset, we note that "it is not and should not be this Court's role to determine the merits of policy positions adopted or rejected by the Commission." *Public Staff I*, 123 N.C. App. at 46, 472 S.E.2d at 196. However, to the extent that we must review the merits of the Commission's policy as an exercise of the Commission's police power under the North Carolina Constitution, we find that the benefit to the public realized by the Commission's exercise of its police power in assigning $3.36 million of the gain on sale to ratepayers is not outweighed by any constitutional deprivation to CWSNC. We do not comment on the merits of the Commission's policy beyond that. Accordingly, we hold that the Commission did not violate Article I, section 19 of the North Carolina Constitution and affirm its 23 December 2011 order.

AFFIRMED.

Judges CALABRIA and ELMORE concur.