IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA16-811

Filed: 19 September 2017

North Carolina Utilities Commission, No. SP-100, Sub 31

STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION; PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION; DUKE ENERGY CAROLINAS, LLC; DUKE ENERGY PROGRESS, LLC; VIRGINIA ELECTRIC AND POWER COMPANY, d/b/a Dominion North Carolina Power, Defendants,

v.

NORTH CAROLINA WASTE AWARENESS AND REDUCTION NETWORK, Plaintiff.

Appeal by Plaintiff from order entered 15 April 2016 by the North Carolina Utilities Commission. Heard in the Court of Appeals 23 February 2017.

*Staff Attorney Robert B. Josey, Jr. and Staff Attorney David T. Drooz, for Defendant-Appellee Public Staff – North Carolina Utilities Commission.*

*Allen Law Offices, PLLC, by Dwight W. Allen and Lawrence B. Somers, for Defendants-Appellees Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC.*

*McGuireWoods, LLP, by Brett Breitschwerdt and Andrea R. Kells, for Defendant-Appellee Virginia Electric & Power Company, d/b/a Dominion North Carolina Power.*

*The Law Offices of F. Bryan Brice, Jr., by Matthew D. Quinn and John D. Runkle for Plaintiff-Appellant North Carolina Waste Awareness and Reduction Network.*

*Burns, Day & Presnell, P.A., by Daniel C. Higgins, for amicus curiae North Carolina Eastern Municipal Power Agency, North Carolina Municipal Power Agency Number 1 and Electricities of North Carolina, Inc.*

*Nelson Mullins Riley & Scarborough LLP, by Joseph W. Eason, for amicus curiae North Carolina Electric Membership Corporation.*

*Southern Environmental Law Center, by David Neal and Lauren Bowen, for amicus curiae North Carolina Interfaith Power and Light, North Carolina Council of Churches, Greenfaith, The Christian Coalition of America, Young Evangelicals for Climate Action, and Creation Care Alliance of Western North Carolina.*

MURPHY, Judge.

Plaintiff North Carolina Waste Awareness and Reduction Network ("NC WARN") appeals from an order of the North Carolina Utilities Commission (the "Commission") concluding that NC WARN was operating as a "public utility," subject to the Commission's jurisdiction, when it entered into an agreement with a Greensboro church (the "Church") to install and maintain a solar panel system on the Church's property and to charge the Church based on the amount of electricity that the system generated. The Commission also concluded that NC WARN's actions constituted a provision of "electric service" to the Church, infringing on the utility monopoly of Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC, (collectively "Duke Energy") in violation of Chapter 62 of the North Carolina General Statutes.

We agree and conclude that NC WARN is acting as a "public utility" by operating its system of solar panels for the Church on the Church's property. Therefore, we affirm the order of the Commission.

## Background

In December 2014, NC WARN entered into a "Power Purchase Agreement" (the "Agreement") with the Church. The Agreement provided that NC WARN would install and maintain a system of solar panels on the Church's property. Under the Agreement, the solar panels would "remain the property of NC WARN" and the Agreement did not "constitute a contract to sell or lease" the solar panels to the Church. In exchange, the Church agreed to compensate NC WARN based on the amount of "electricity produced by the system" at a rate of $0.05 per kWh.

In June 2015, NC WARN filed a request with the Commission for a declaratory ruling that its proposed activities under the Agreement would not cause it to be regarded as a "public utility" pursuant to the Public Utilities Act (the "Act").

The Commission, however, concluded that NC WARN's arrangement with the Church constituted a public utility in violation of the Act. In addition, the Commission ordered that NC WARN refund its charges to the Church and pay a fine of $200 for each day that NC WARN provided electric service to the Church through the solar panel system.[1] NC WARN timely appealed the Commission's order.

## Analysis

---

[1] The Commission also provided that all penalties imposed "shall be waived upon NC WARN's honoring its commitment to refund all billings to the Church and ceasing all future sales."

The dispositive issue on appeal is whether the Commission correctly determined that NC WARN was operating as a "public utility." *See State ex rel. N.C. Utils. Comm'n v. New Hope Rd. Water Co.*, 248 N.C. 27, 29, 102 S.E.2d 377, 379 (1958) ("The Commission has no jurisdiction over these respondents unless they are public utilities within the meaning of [the Public Utilities Act]."). This issue is a question of law, which is reviewed de novo by our Court. N.C.G.S. § 62-94(b) (2015) ("[T]he court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions."); *New Hope*, 248 N.C. at 30, 102 S.E.2d at 379 ("[T]he question of whether or not a particular company or service is a public utility is a judicial one which must be determined as such by a court of competent jurisdiction."); *State ex rel. Utils. Comm'n v. Envir. Defense Fund*, 214 N.C. App. 364, 366, 716 S.E.2d 370, 372 (2011) ("Questions of law are reviewed *de novo*.").

The Public Utilities Act, found in Chapter 62 of our General Statutes, gives the Commission the power to supervise and control the "public utilities" in our State. N.C.G.S. § 62-30 (2015). A "public utility" as defined in the Act is any entity which owns and operates "equipment and facilities" that provides electricity "to or for the public for compensation." N.C.G.S. § 62-3(23)(a) (2015).

In the present case, there is no doubt that NC WARN owns and operates equipment (a system of solar panels) which produces electricity and that NC WARN receives compensation from the Church in exchange for the electricity produced by

the system. The dispute here is whether NC WARN is producing electricity "for the public," therefore, making it a "public utility."

"The public does not mean everybody all the time." *State ex rel. Utils. Comm'n* v. *Simpson*, 295 N.C. 519, 522, 246 S.E.2d 753, 755 (holding that the defendant was offering his two-way radio communication service to "the public" even though he was offering the service exclusively to members of the Cleveland County Medical Society, which was comprised of only 55 to 60 people) (citation omitted). Instead:

> One offers service to the 'public' within the meaning of [N.C.G.S. § 62-3(23)(a)(1)] when he holds himself out as willing to serve all who apply up to the capacity of his facilities. It is immaterial, in this connection, that his service is limited to a specified area and his facilities are limited in capacity. For example, the operator of a single vehicle within a single community may be a common carrier.

*State ex rel. Utils. Comm'n v. Carolina Tel. & Tel. Co.*, 267 N.C. 257, 271, 148 S.E.2d 100, 111 (1966) (offering his mobile radio telephone service in the Kinston area to an anticipated 33 subscribers). However, this framework "is merely the beginning and not the end of our inquiry[,]" as a person might still be offering his services to the "public" even when he serves only a selected class of persons. *Simpson*, 295 N.C. at 525, 246 S.E.2d at 757. In further deconstructing the definition of "public," within the context of a selected class of consumers our Supreme Court instructed that whether an entity or individual is providing service to the "public":

> depends . . . on the regulatory circumstances of the case . . . [including] (1) nature of the industry sought to be regulated; (2) type of market served by the industry; (3) the kind of competition that naturally inheres in that market; and (4) effect of non-regulation or exemption from regulation of one or more persons engaged in the industry.

*Id.* at 524, 246 S.E.2d at 756. This interpretation is meant to be flexible so as to adjust according to "the variable nature of modern technology," and, ultimately, the touchstone of our analysis is: what "accomplish[es] the legislature's purpose and comports with its public policy." *Id.* at 524, 246 S.E.2d at 757 (citation and internal quotation marks omitted).

i.  *The Simpson Factors*

In the instant case, NC WARN seeks "to provide affordable solar electricity to non-profits." If we uphold the Agreement NC WARN has in place with the Church, NC WARN would like "to provide similar projects to other non-profits in the future." In that way, NC WARN serves, or seeks to serve, a subset of the population, just as the defendant did in *Simpson*. Therefore, in order to evaluate whether this activity violates the Act, we must consider the factors outlined by our Supreme Court.[2]

---

[2] Even though NC WARN is only offering its services to a subset of the population, it has offered to provide all of the energy produced by the solar system located on the Church's roof to the Church itself, and in this way NC WARN has shown itself to be willing to serve the Church up to the full capacity of NC WARN's facility – in this case up to the full capacity of the solar system at issue. Moreover, the Agreement provides that "any electricity generated by the system, for example, during times of low on-site usage, will be put onto the power grid and credited against the kilowatt (kWh) sold to [the Church] by Duke Energy." The transfer of energy produced by the solar system to the energy grid for unrestricted use by any and all of Duke Energy's Greensboro customers leads us to conclude

Discussion of (1) the nature of the industry and (2) type of market served by the industry overlap. The Greensboro area has been assigned exclusively to Duke Energy, just as other regions of the state are exclusively assigned to other electricity suppliers. North Carolina law precludes retail electric competition and establishes regional monopolies on the sale of electricity based on the premise that the provision of electricity to the public is imperative and that competition within the marketplace results in duplication of investment, economic waste, inefficient service, and high rates. *Carolina Tel. & Tel. Co.*, 267 N.C. at 271, 148 S.E.2d at 111 ("[N]othing else appearing, the public is better served by a regulated monopoly than by competing suppliers of the service."). In particular, although the provision of electricity might be lucrative in some areas, it may also be costly in others. Monopolies exist in North Carolina so that it makes financial sense for utilities to serve all North Carolinians and so that service can be provided at a reasonable price. *See Simpson*, 295 N.C. at 525, 246 S.E.2d at 757 (recognizing that exempting certain radio service providers from regulation would "leave burdensome, less profitable service on the regulated portion resulting inevitably in higher prices for the service").

For these reasons, the legislature has elected to prohibit (3) any competition that might otherwise naturally exist in the market and to limit providers of electricity

---

that NC WARN is in fact "hold[ing itself] out as willing to serve all who apply up to the capacity of [its] facilities." *Id.* at 522, 246 S.E.2d at 755.

to specific providers in different regions of the state. *Id.* at 271, 148 S.E.2d at 111. NC WARN's activities are in direct competition with Duke Energy's services, as both entities are selling kilowatt hours of electricity to Duke Energy's customers.

Perhaps most importantly to our review of this case, however, is an evaluation of (4) the effect of non-regulation or exemption from regulation of one or more persons engaged in the industry. NC WARN maintains that it only intends to provide its services "to self-selected non-profit organizations" and has no desire to offer its services to all of Duke Energy's customers.[3] However, the Supreme Court of North Carolina previously rejected this same argument in *Simpson* when the defendant argued that he was spared from regulation because he only endeavored to provide his services to the Cleveland County Medical Society. 295 N.C. at 525, 246 S.E.2d at 757. In that case, the Supreme Court concluded, "[w]ere a definition of 'public' adopted that allowed prospective offerors of services to approach these separate classes without falling under the statute, the industry could easily shift from a regulated to a largely unregulated one." *Id.* at 525, 246 S.E.2d at 757.

Simply put, Duke Energy has been granted an exclusive right to provide electricity in return for compensation within its designated territory and with that

---

[3] In its request for declaratory judgment, NC WARN acknowledges its intent to expand this program in stating, "An adverse ruling by the Commission would restrict NC WARN's ability to enter into similar funding mechanisms through [Power Purchase Agreements] with other churches and non-profits, as funds become available." **{R. p. 9}**

right comes the obligation to serve all customers at rates and service requirements established by the Commission. NC WARN desires to serve customers of its own choosing within Duke Energy's territory at whatever rates and service requirements it sets for itself without oversight. Although NC WARN at the present date is only providing its services to a small number of organizations in the Greensboro area, if it were allowed to generate and sell electricity to cherry-picked non-profit organizations throughout the area or state, that activity stands to upset the balance of the marketplace. Specifically, such a stamp of approval by this Court would open the door for other organizations like NC WARN to offer similar arrangements to other classes of the public, including large commercial establishments, which would jeopardize regulation of the industry itself.[4]

ii.    *Legislative Intent*

Under *Simpson*, our analysis of whether an entity is selling energy to the "public" ultimately hinges on the query: what accomplishes the legislature's purpose and comports with public policy? *Simpson*, 295 N.C. at 524, 246 S.E.2d at 756-57 (citation omitted). Chapter 62 of the North Carolina General Statutes contains the

---

[4] The Dissent notes that within the last decade the Commission concluded in two separate cases that "similar" arrangements by third-party solar services providers did not turn those providers into public utilities. However, those cases are not before us now, nor are "past decisions of a previous panel of the North Carolina Utilities Commission . . . binding on later panels of the Commission or this Court." *Utils. Comm'n v. Carolina Water Serv., Inc. of N.C.*, 225 N.C. App. 120, 131 n. 6, 738 S.E.2d 187, 194 n. 6 (2013). Accordingly, they have no bearing on the present appeal.

Public Utilities Act, which establishes a comprehensive set of regulations for public utilities in the state. The "Declaration of policy" proclaims, *inter alia*, that "[i]t is hereby declared to be the policy of the State of North Carolina: . . . (2) To promote the inherent advantage of regulated public utilities[.]" N.C.G.S. § 62-2(a)(2) (2015). Doing so allows for the "availability of an adequate and reliable supply of electric power . . . to the people, economy and government of North Carolina[.]" *Id.* § 62-2(b). In that way, the declaration clearly reflects the policy adopted by the legislature that a regulated monopoly best serves the public, as opposed to competing suppliers of utility services. *Carolina Tel. & Tel. Co.*, 267 N.C. at 271, 148 S.E.2d at 111.

It is also true that the General Assembly has recently declared that it is also the policy of this state "[t]o promote the development of renewable energy and energy efficiency." N.C.G.S. § 62-2(a)(10); *see also* N.C.G.S. § 105-277 (2015) (exempting from taxation solar systems used to heat a property). However, statutory pronouncements of policy are meant to coexist with North Carolina's well-established ban on third-party sales of electricity rather than supersede it until such time as the monopoly model is abandoned by our legislature. *See Taylor v. City of Lenoir*, 129 N.C. App. 174, 178, 497 S.E.2d 715, 719 (1998) ("[S]tatutes relating to the same subject or having the same general purpose, are to be read together, as constituting one law . . . such that equal dignity and importance will be given to each." (citation and internal quotation marks omitted)).

If the legislature desires to except these types of third-party sales, it is within its province to do so and it is not for this Court to determine the advisability of any change in the law now declared in the Public Utilities Act. *See State ex rel. Utils. Comm'n v. Lumbee River Elec. Membership Corp.*, 275 N.C. 250, 257, 166 S.E.2d 663, 668 (1969) ("It is for the Legislature, not for this Court or the Utilities Commission, to determine whether the policy of free competition between suppliers of electric power or the policy of territorial monopoly or an intermediate policy is in the public interest.").

## **Conclusion**

We hold, therefore, that NC WARN is operating as a public utility within the meaning of N.C.G.S. § 62-3. Consequently, NC WARN is subject to regulation by the Commission. Accordingly, we affirm the order of the Commission from which NC WARN appealed.

AFFIRMED.

Judge STROUD concurs.

Judge DILLON dissents by a separate opinion.

DILLON, Judge, dissenting.

I conclude that NC WARN is not acting as a "public utility" because the solar panel system at issue is not serving "the public," but rather is designed to generate power for a single customer (the "Church") from the Church's property. Therefore, I respectfully dissent.

The Public Utilities Act gives the Commission the power to supervise and control the "public utilities" in our State. N.C. Gen. Stat. § 62-30 (2015). A "public utility" as defined by our General Assembly is any entity which "own[s] or operate[s]" "equipment or facilities" that provide "electricity" "*to or for the public* for compensation." N.C. Gen. Stat. § 62-3(23)(a) (2015) (emphasis added).

I agree with the majority that NC WARN "owns and operates" "equipment" (a system of solar panels) which provides "electricity" "for compensation." However, I disagree with the majority that the equipment at issue here is designed to produce electricity "for the public," because the system of solar panels in this case is designed to produce electricity on the property of a single customer for that customer's sole use.

Our Supreme Court has had occasion to define the contours of what constitutes a "public utility," subject to regulation by our Utilities Commission. But every instance cited by the majority where our Supreme Court has determined that a "public utility" exists involved equipment or a facility which served *multiple customers*. The majority's decision today appears to be the first in North Carolina where equipment designed to generate power (or other utility-type service) for a

single customer from the customer's own property is held to be a "public utility" subject to regulation by our Utilities Commission.

In 1958, for instance, our Supreme Court stated that "the true criterion by which to determine whether a plant or system is a public utility is whether or not the public may enjoy it of right or by permission only[.]" *Utilities Comm'n v. New Hope*, 248 N.C. 27, 30, 102 S.E.2d 377, 379 (1958). The Court further stated that "an attempt to declare a company or enterprise to be a public utility, where it is inherently not such, is, by virtue of the guaranties of the federal Constitution, void wherever it interferes with private rights of property or contract." *Id.* NC WARN's solar panel equipment at issue here is not designed to be enjoyed by the public either by right or by permission; rather, the system was designed only to be enjoyed *by the Church*, pursuant to a private contractual agreement.

Ten years later, in 1968, our Supreme Court considered the definition of "the public" in the context of utilities regulation in *Utilities Comm'n v. Carolina Telegraph Co.*, 267 N.C. 257, 148 S.E.2d 100 (1966), a case in which a company sought to establish a mobile radio telephone service for a small area with an estimated thirty-three (33) customers. Our Supreme Court held that the operation was a public utility, stating:

> One offers service [to] the "public" within the meaning of
> th[e] statute when he holds himself out as willing to serve
> all who apply up to the capacity of [his] facilities. . . . For
> example, the operator of a single vehicle within a single

community may be a common carrier. *Id.* at 268, 148 S.E.2d at 109. However, NC WARN's solar panel "facility" is markedly different than the "public utility" described by the Supreme Court in this 1968 opinion. Where the "single vehicle" in the Supreme Court's example is designed to serve multiple members of the public, the solar panel equipment at issue here is designed to serve only one customer, and has not been made available to any other customer.

A decade later, in 1978, in the case relied upon by the majority today, our Supreme Court clarified *Carolina Telegraph* by holding that a system may be serving "the public" even where it serves only a "selected class of persons" and is not designed to serve "everybody all the time." *Utilities Comm'n v. Simpson*, 295 N.C. 519, 522, 246 S.E.2d 753, 755 (1978). In *Simpson*, the Court articulated a list of factors, cited by the majority, which inform whether a particular enterprise is considered a "public utility." I believe the majority applied these factors much more broadly than *Simpson* intends.

In *Simpson*, our Supreme Court provides a guide as to the application of these factors by referencing a number of cases from other jurisdictions, concluding that those cases all "seem correctly decided." *Id.* at 524, 246 S.E.2d at 756. Several of those cases cited concluded that certain operations – each of which were designed to serve multiple customers – constituted "public utilities," where each operation was

designed to serve a select class of customers rather than the public at large.  However, our Supreme Court also cited a Pennsylvania case which concluded that the furnishing of electric service to tenants of a single apartment building by the building owner (where the owner bought electricity from the public utility company and then resold it to its tenants) did *not* constitute the operation of a public utility:  "Here . . . those to be serviced consist only of a special class of persons – those to be selected as tenants – *and not a class opened to the indefinite public*.  Such persons clearly constitute a defined, privileged[,] and limited group and the proposed service to them would be private in nature."  *Id.* at 524-25, 246 S.E.2d at 756 (quoting *Drexelbrook v. Pennsylvania Public Utility Comm'n*, 418 Pa. 430, 436, 212 A.2d 237, 240 (1965).  NC WARN's system is designed to serve a group even more limited (a single customer) than the group served by the system in the Pennsylvania case (tenants in a single building).

In the years since *Simpson* was decided, our appellate courts have applied *Simpson* to determine whether a certain enterprise constituted a "public utility."  Many of these cases are cited by the Commission in support of its order.  However, unlike the present case, each of those cases involved a system which provided some utility service to *multiple* consumers accessing the system.  *See Simpson*, 295 N.C. at 520, 246 S.E.2d at 754 (two-way radio service operated in conjunction with telephone answering service, using tower that serves multiple subscribers); *Bellsouth Carolinas*

*PCS, L.P. v. Henderson Cty. Zoning Bd. Of Adjustment*, 174 N.C. App. 574, 621 S.E.2d 270 (2005) (cellular telephone company operating cellular telephone tower serving multiple customers); *Utilities Comm'n v. Mackie*, 79 N.C. App. 19, 338 S.E.2d 888 (1986), *aff'd as modified*, 318 N.C. 686, 351 S.E.2d 289 (1987) (sewer and water service with approximately twenty-five (25) customers served from a single tank); *Utilities Comm'n v. Buck Island, Inc.*, 162 N.C. App. 568, 592 S.E.2d 244 (2004) (facilities used to produce water and treat sewage in housing development); *Shepard v. Bonita Vista Properties, L.P.,* 191 N.C. App. 614, 664 S.E.2d 388 (2008), *aff'd*, 363 N.C. 252, 675 S.E.2d 332 (2009) (campground charging the occupants of each campsite for use of electricity from a single system at above-market price).

In conclusion, I believe that our Supreme Court's jurisprudence compels the conclusion in the present case that NC WARN's equipment, which is designed to generate power for a single customer, is *not* a "public utility." This conclusion is also consistent with the General Assembly's declared policy in the Public Utilities Act "[t]o promote the development of renewable energy" and "encourage private investment in renewable energy and energy efficiency." *See* N.C. Gen. Stat. § 62-2(a)(10); *see also* N.C. Gen. Stat. 105-277 (exempting solar panel systems used to heat a property from taxation); *see also Simpson*, 295 N.C. at 524, 246 S.E.2d at 757 (stating that the definition of "public" must "accomplish the legislature's purpose and comport[] with its public policy") (internal marks and citation omitted)).

Further, this conclusion is consistent with the prior opinions of the Commission in *In re Application of FLS YK Farm, LLC*, N.C.U.C. Docket No. RET-4, Sub 0 (April 22, 2009) and *In re Request by Progress Solar Investments, LLC*, N.C.U.C. Docket No. SP-100, Sub 24 (Nov. 25, 2009). In those cases, the Commission concluded that the entities at issue were *not* public utilities where the entities "owne[d] or operat[ed] solar thermal panels located on-site to a single entity pursuant to a 'bargained for' transaction[.]" *Progress Solar*, N.C.U.C. Docket No. SP 100, Sub 24; *FLS YK Farm*, N.C.U.C. Docket No. RET-4, Sub 0. And in *FLS YK Farm*, the Commission noted that "FLS YK Farm will not be holding itself out to provide solar thermal heat production to the general public, but rather plans to sell the BTUs ("British Thermal Units") created by its on-site thermal panels only to the [Inn] and solely for the purpose of heating water owned by [the Inn]."

In the present case, however, the Commission has reached an opposite conclusion in spite of the fact that, like the providers in *FLS YK Farm* and *Progress Solar*, NC WARN owns and maintains the equipment on the property of a single customer which is designed to generate power from the customer's property for the sole use of that customer (and for no other NC WARN customer). The Commission seems to distinguish NC WARN's arrangement with the Church from its prior decisions merely based on the manner NC WARN is being *compensated* by the Church. Indeed, at oral argument, counsel for the Commission stated that if NC

WARN's arrangement with the Church were structured as a lease agreement, rather than as a contract where NC WARN was compensated based on the Church's usage, the Commission would not be challenging the arrangement in court.

However, to me, the manner in which NC WARN and the Church choose for NC WARN to be compensated – based on usage rather than based on a flat rate per month – does not convert NC WARN's solar panel system on the Church's property into a public utility. Indeed, a hardware store renting a portable generator to a homeowner would not be acting as a public utility if it chose to charge the customer, at least in part, based on the power generated by the generator rather than solely at a flat daily rate. Such billing is a logical method by which private parties should be free to contract to account for wear and tear on the system itself. Certainly it is true that the more the system operates, the quicker its components deteriorate and need maintenance, repair, or replacement. And N.C. Gen. Stat. § 62-3(23) does not deem the *form of compensation* relevant to the determination of whether a system is serving "the public." Certainly, the Commission would not argue that Duke Energy would cease operating as a public utility subject to regulation if it changed its billing method to a flat monthly rate for unlimited access to its power grid.

Additionally, I would point out that the fact that NC WARN might, in the future, enter into similar private contracts with other entities seeking to install other solar panel systems does not compel the conclusion that NC WARN is holding itself

out as willing to serve "all who apply up to the capacity *of [the] facilit[y]*" *at issue here*. Indeed, a hardware store does not act as a public utility simply because it leases out more than one generator. The *Simpson* factors focus on the *function of the single system or facility at issue*, *not* the company offering the service, the company's marketing of its service, or the manner of compensation given to the company in exchange for the service. Here, NC WARN is not holding itself out as willing to serve others up to the capacity of the Church's solar system. NC WARN's system will produce electricity solely for the Church and the power generated by the system is not accessible by NC WARN or any other party or entity.[5] I disagree with the majority's characterization of the Church itself – a single customer – as "the public." *See Simpson*, 295 N.C. at 524, 246 S.E.2d at 757.

In conclusion, this case does not involve a solar panel farm providing power to multiple customers off-site. It involves solar panel equipment located on the property of a single customer designed to produce power for that customer where no adjacent property owners or other members of the public have the right to tap into the system. Based on the General Assembly's current definition of "public utility," I conclude that NC WARN's system is not a public utility and is thus not subject to regulation by our

---

[5] The majority notes, in a footnote, that the fact that the excess energy created by the Church's system will be transferred to Duke Energy's power grid "leads us to conclude that NC WARN is in fact 'hold[ing itself] out as willing to serve all who apply up to the capacity of [its] facilities." I am wholly unpersuaded by this characterization, and do not believe there is sufficient information in the record from which we could undertake an informed interpretation of Duke Energy's voluntary net metering credit program.

Utilities Commission. The General Assembly is certainly free to broaden the definition of "public utility" (within constitutional limits). However, based on the General Assembly's current definition and our Supreme Court's jurisprudence, I vote to reverse the Commission's decision regarding this private contract between NC WARN and the Church. *See New Hope*, 248 N.C. at 30, 102 S.E.2d at 380 ("[A]n attempt to declare [NC WARN] to be a public utility where it is inherently not such, is . . . void wherever it interferes with private rights of . . . contract.").